NATIONAL LABOR RELATIONS BOARD, Petitioner,

and

Rochester Telephone Corporation, Intervenor,

v.

COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, LOCAL 1170, Respondent.

No. 69, Docket 72–1298.

United States Court of Appeals, Second Circuit.

Argued Oct. 17, 1972.

Decided Dec. 21, 1972.

Mansfield, Circuit Judge, concurred in result and filed opinion.

Joseph C. Thackery, Atty., NLRB, Washington, D. C. (Peter G. Nash, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Robert A. Giannasi, Atty., NLRB, Washington, D. C., on brief), for petitioner.

Eugene D. Ulterino, Rochester, N. Y. (Nixon, Hargrave, Devans & Doyle, Rochester, N. Y., on brief), for intervenor.

Richard Lipsitz, Buffalo, N. Y. (Lawrence A. Schulz and Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N. Y., on brief), for respondent.

Before MANSFIELD, OAKES and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

The petition to enforce an order of the National Labor Relations Board, 194 N.L.R.B. No. 144 (1972), in this some-

what off the beaten path labor case, presents essentially two issues:

(1) Whether there was substantial evidence to support the Board's conclusion that the Union [1] violated Section 8(b)(3) of the Act [2] by its adoption of an embargo against acceptance of temporary supervisory assignments in contravention of a practice agreed upon between the parties, although not incorporated in the existing collective bargaining agreement.

(2) Whether there was substantial evidence to support the Board's conclusion that the Union violated Section 8(b)(1)(A) of the Act by subjecting employees to disciplinary action for refusing to comply with the embargo.

For the reasons stated below, we hold that there was substantial evidence to support the Board's conclusions on both issues. We enforce the Board's order.

## I.

This case is concerned with the Company's [3] practice of assigning unit employees to temporary supervisory positions. Such practice has never been covered by a provision in a collective bargaining agreement between the Company and the Union, including the one in effect at the time of the Union's embargo and disciplinary action to enforce the embargo referred to below. The Company and the Union have entered into successive collective bargaining agreements since the early 1950's.

In 1960, the Company began the practice of assigning unit employees to act as temporary supervisors. This was to replace supervisors who were on vacation or sick leave. The Union frequently complained about this practice. Its complaints were directed chiefly at assignments that lasted more than 30 days and those where unit employees were assigned to supervise their own work groups.

It was not until the 1967 contract negotiations, however, that the Union proposed complete elimination of the temporary supervisory assignment practice. After considerable discussion of the proposal and much backing and filling by both parties, the upshot was that the Union withdrew its proposal altogether and the Company agreed to outline in a letter to the Union (not to be incorporated in the contract) its procedures with respect to temporary supervisory assignments. On the following day, the 1967 collective bargaining agreement was signed. It contained no mention of temporary supervisory assignments.

As agreed, the Company did inform the Union by letter in June 1967 of its temporary assignment procedures, including the promise that "whenever possible" employees would not be assigned to supervise their own work groups. In an exchange of letters with the Union in October 1967, the Company reaffirmed its earlier agreement to limit such assignments to no longer than 30 days.

In 1968, at the Union's request, the entire collective bargaining agreement was renegotiated. The subject of temporary supervisory assignments was not raised by either party. The new agreement contained no restrictions on the Company's right to make such assignments. It has continued to make them.

In July 1970, the Union for the first time filed a formal grievance complaining of one temporary supervisory assignment that lasted six weeks. In settling this grievance, the Company again confirmed in writing its policy that such assignments should not exceed 30 days.

Also in 1970, the Union and the Company entered into a written agreement with respect to the equalization of overtime among unit employees. This agree-

1. Communications Workers of America, AFL-CIO, Local 1170 (the Union).

2. National Labor Relations Act, 29 U.S.C. § 151 et seq. (1970) (the Act).

3. Rochester Telephone Corporation (the Company).

ment contained a provision that an employee who was away from his regular job on a temporary supervisory assignment would be charged with the actual overtime hours worked.

At no time since 1967 has the Union sought to abolish, or requested to bargain about, the Company's temporary supervisory assignment practice.

On November 9, 1970—eleven months before the expiration of the 1968 collective bargaining agreement—at a regularly scheduled membership meeting, the Union voted (1) an embargo on acceptance of all temporary supervisory assignments effective December 1, 1970, and (2) to penalize those who violated the embargo.

Since imposition of the embargo, the Company has had difficulty getting unit employees to accept temporary supervisory assignments. Two employees, one a Union member and one a nonmember, who accepted such assignments despite the embargo have had charges filed against them by the Union.

Following the filing of charges against the Union by the Company on February 23, 1971, pleadings were filed and in due course an evidentiary hearing was held before a trial examiner in Rochester, New York on May 28, 1971. The examiner on August 19, 1971 filed his decision which included findings of fact, conclusions of law and a recommended order. The Board on January 6, 1972 filed its decision and order. 194 N.L.R.B. No. 144. The Board's order, which adopted the examiner's recommended order with certain modifications,[4] required the Union to cease and desist from conduct found to be in violation of §§ 8(b)(3) and 8(b)(1)(A) of the Act and to take certain affirmative action to remedy such violations.

## II.

In the light of the foregoing summary of the evidence and prior proceedings leading to the instant petition by the Board for enforcement of its order, we turn directly to the central issue before us: Whether the Union's action of November 9, 1970 in voting an embargo on acceptance of all temporary supervisory assignments constituted an unfair labor practice in violation of § 8(b)(3). We hold that it did.

■  Under § 8(b)(3), it is an unfair labor practice for a representative union "to refuse to bargain collectively with an employer." The collective bargaining obligation, as defined in § 8(d), includes a duty not to terminate or modify an existing contract unless the party seeking such termination or modification gives to the other party specified notification in advance of the expiration date or offers to reopen negotiations. Concededly there was no such notification or offer to reopen negotiations on the part of the Union here.

The crux of the controversy therefore is whether the Union's unilateral adoption of an embargo on acceptance of temporary supervisory assignments in midterm of the Union's collective bargaining agreement with the Company was in derogation of an agreed-upon practice not incorporated in the collective bargaining agreement.

■  We hold that the evidence clearly established a contemporaneous bargain, made at the time the parties entered into the 1967 collective bargaining agreement, with respect to the Company's practice of assigning unit employees to temporary supervisory positions. In short, we hold that there was

4. The only material modification of the trial examiner's recommended order made by the Board was deletion of the provision directing the Union to bargain with the Company. The Board held that, "although the Union was free to request dis-

cussion, the Company was not required by Section 8(d) of the Act to agree to, or even to bargain with the Union about, changing the existing agreement during its term."

substantial evidence to support the Board's specific finding in this regard:

"In the instant case . . . the parties bargained about abolishing the Company's practice of assigning unit employees to temporary supervisory positions and reached an accord, pursuant to which the Union agreed to withdraw, and did withdraw, its demand to abolish the practice, in return for a letter of commitment from the Company outlining its procedures in implementing the practice. This agreement, therefore, became part of the contemporaneous bargain which the parties made in executing their 1967 contract. (citing The Jacobs Manufacturing Company, 94 N.L.R.B. 1214, 1227–28 (1951), enforced, 196 F.2d 680 (2 Cir. 1952)). And, since the Union did not renew its demand in the 1968 contract negotiations, the Company had a right to rely on the Union's prior acquiescence in the practice, subject to the limitations agreed to by the Company, and to assume that its rights remained unchanged."

Under similar circumstances, we recently have held that a union's attempt unilaterally and in midterm to alter an existing collective bargaining agreement constituted a violation of § 8(b)(3). New York Dist. Council No. 9 v. NLRB, 453 F.2d 783 (2 Cir. 1971), cert. denied, 405 U.S. 988 (1972) (the *Westgate* case). In *Westgate*, the collective bargaining agreement provided for a 35 hour work week. The union, during the term of the bargaining agreement, adopted a rule limiting to 10 the number of rooms which unit employees were allowed to paint per week, thus reducing the average weekly output per man from 11.5 rooms to 10. The contract was silent regarding the matter on which the union acted unilaterally. We held that:

"By enforcing the rule the Union is in substance modifying this term to stipulate that journeymen are not to work a five day, seven-hour per day work week, but are to work only so long as it takes them to paint 10 rooms. We

therefore agree with the Board that before the Union can enforce this modification of the collective bargaining agreement, it must bargain collectively with the Association over the issue." 453 F.2d at 787.

The evidence in the instant case establishes even more clearly than in *Westgate* the existence of an agreement between the parties on the matter with respect to which the Union acted unilaterally, although the contracts in both cases were silent on the matter. In *Westgate*, the contract's silence was due to the fact that the parties, having bargained during their last contract negotiations about maximum production standards, *failed to reach agreement on the matter*. In the instant case, the contract's silence reflected *the parties' agreement to continue the Company's practice of assigning employees to temporary supervisory positions*. As the Board found, based on substantial evidence, "[i]n fact, the earlier understandings and written statement of policy clearly were intended to, and did, continue as an integral part of the totality of the contract between the parties."

Upon these facts, we find the principle enunciated by the Supreme Court in Scofield v. NLRB, 394 U.S. 423, 432–33 (1969), to be applicable here. In *Scofield*, the Court, in upholding as not violative of § 8(b)(1) the enforcement of a union rule regarding production quotas, held as follows with respect to the position of the company which is strikingly similar to that of the Union in the instant case:

"The company has repeatedly sought an agreement eliminating the piecework ceiling, an agreement which, had it been obtained, unquestionably would have been violated by the union rule. But the company could not attain this. Although, like the union, it could have pressed the point to impasse, . . . it has never done so. Instead, it has signed contracts recognizing the ceiling, has tolerated it, and has cooperated in its administration by honoring requests by employees to bank their

pay for over-ceiling work. We discern no basis in the statutory policy encouraging collective bargaining for giving the employer a better bargain than he has been able to strike at the bargaining table." 394 U.S. at 432–33. (citation and footnote omitted). Here, as in *Scofield,* we find no statutory policy in favor of giving the Union a better bargain than it was able to strike at the bargaining table.

We hold that there was substantial evidence to support the Board's conclusion that the Union's embargo against acceptance of temporary supervisory assignments constituted a violation of § 8(b)(3).

### III.

The sequel to our holding above that the Union's embargo constituted a violation of §8(b)(3) is that the Union's enforcement of the embargo constituted a violation of § 8(b)(1)(A).

With respect to the nonmember of the Union against whom written charges were brought (DiMaria), the Union's action restrained and coerced her in the exercise of her § 7 rights in violation of § 8(b)(1)(A). See Booster Lodge No. 405 v. NLRB, 459 F.2d 1143, 1150–55 (D.C.Cir.1972), aff'd, —— U.S. —— (May 21, 1973) (per curiam). With respect to the Union member (Cammarata), the Union's similar disciplinary action also constituted a restraint and coercion not sanctioned by the proviso to § 8(b)(1)(A) because the charges against her did not stem from violations of a lawful union rule dealing with purely internal union matters but sought to enforce conduct we have held violated §§ 8(d) and 8(b)(3).

As the Supreme Court said in *Scofield,* "it has become clear that if the rule invades or frustrates an overriding policy of the labor laws the rule may not be enforced, even by fine or expulsion, without violating § 8(b)(1)." 394 U.S. at 429. We have held above that the adoption of the embargo was in violation of §§ 8(d) and 8(b)(3), and therefore was invasive of an overriding policy of the labor laws.

We hold that there was substantial evidence to support the Board's conclusion that the Union's conduct in subjecting employees to disciplinary action for refusing to comply with the embargo constituted a violation of § 8(b)(1)(A).

### IV.

We have considered and find without merit the Union's alternative contention that the Board should not have assumed jurisdiction over this dispute since, according to the Union, it arose over the terms and meaning of an agreement and should have been settled by resort to the grievance and arbitration procedures provided for in the collective bargaining agreement.

Enforced.

MANSFIELD, Circuit Judge (concurring):

Although I concur in the result reached in Judge Timbers' carefully considered opinion, I am not entirely in agreement with one aspect of its reasoning.

I agree that the Board's finding that the parties reached a prior understanding, partly oral and partly written, regarding temporary assignment procedures was supported by substantial evidence and that the Union's unilateral embargo in disregard of that understanding violated its obligation "to bargain collectively" in accordance with § 8(b)(3), 29 U.S.C. § 158(b)(3). But in my view we could enforce the Board's order, as interpreted by it, only if we agreed with it that the past practices and prior understandings as to assignment of temporary supervisors were "contained in a contract" as that phrase is used in § 8(d), 29 U.S.C. § 158(d), which defines the phrase "to bargain collectively." I would so hold. Under such a holding the Company would not be "required . . . to agree to, or even to bargain with the Union about, changing the existing agreement during its term." Decision of the Board, Appendix 6. The reasoning of the majority opinion, however, by relying on the

"contract's silence" and analogizing the case to Westgate, New York Dist. Council v. N. L. R. B., 453 F.2d 783, 787 (2d Cir. 1971), cert. denied, 405 U.S. 988, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972), upon which the Trial Examiner relied, should logically permit the Union at any time during the term of the contract to initiate bargaining on the issue, since the contract is "silent on the matter." The Board, modifying the Trial Examiner's proposed order, rejected such reasoning.

Section 8(d) [1] bars reopening or modification of an existing collective bargaining agreement except upon stated conditions that were not followed by the Union in this case. It further provides that these conditions "shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions *contained in a contract* for a fixed period. . . . ." (emphasis supplied). I am persuaded that, absent a clause to the effect that the formal agreement incorporates all understandings between the parties—and no such term is found in the formal agreement here—a prior understanding of the type in this case, partly oral and partly written, may constitute a term of the "contract" between the parties within the meaning of § 8(d) even though it has not been physically incorporated in a formal collective bargaining agreement. This view is amply supported by

precedent. United Steelworkers v. NLRB, 456 F.2d 248, 249 (3d Cir. 1972); Jacobs Manufacturing Co., 94 N.L.R.B. 1214, 1227 (1951) (concurring opinion), enfd., NLRB v. Jacobs Mfg. Co., 196 F.2d 680 (2d Cir. 1952); Speidel Corp., 120 N.L.R.B. 733, 738 (1958).

"I believe that this Respondent was *not* under a duty to discuss the Union's *group insurance* demand.

\* \* \* \* \* \*

"In my opinion, it is only reasonable to assume that rejection of the Union's basic proposal, coupled in this particular instance with enhancement of the substantive benefits, constituted a part of the contemporaneous 'bargain' which the parties made when they negotiated the entire 1948 contract. In the face of this record as to what the parties discussed and did, I believe that it would be an abuse of this Board's mandate to throw the weight of Government sanction behind the Union's attempt to disturb, in midterm, a bargain sealed when the original agreement was reached.

"To hold otherwise would encourage a labor organization—or, in a Section 8(b)(3) case, an employer—to come back, time without number, during the term of a contract, to demand resumed discussion of issues which, although perhaps not always incorporated in the written agreement, the

---

1. Section 158(d) defines the phrase "to bargain collectively" as the

"performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . *Provided,* That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date. . . .

(2) offers to meet and confer with the other party. . . .

(3) [notifies the appropriate conciliation services]. . . .

(4) [does not resort to strike or lock out and gives full force to contract] for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:

". . . [t]he duties so imposed [2–4] shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions *contained in a contract* for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract. . . . ." 29 U.S.C. § 158(d). (Emphasis supplied)

other party had every good reason to believe were put at rest for a definite period." *Jacobs Manufacturing Co., supra* at 1227–28.

In *Westgate*, relied upon by the majority, the failure of the parties to reach agreement on production quotas barred the Union from unilaterally modifying the 35-hour work week provision of the 'formal collective bargaining agreement and entitled the employer to restrict the Union to the four corners of that agreement.[2] I do not view that case as supporting the proposition upon which our decision depends, namely, that where earlier understandings constitute part of the contract between the parties they may rely upon such terms, even though the terms are *not* found within the four corners of the formal written agreement.

Goldberg, Circuit Judge, concurred specially, dissented from denial of petition for rehearing and filed opinions.

2. "In our opinion the Union's enforcement of the 10-room rule violates the term of the September 9th collective bargaining agreement that stipulates that the standard work week for journeymen painters shall consist of five seven-hour days. · By enforcing the rule the Union is in substance modifying this term to stipulate the journeymen are not to work a five day, seven-hour per day work week, but are to work only so long as it takes them to paint 10 rooms. We therefore agree with the Board that before the Union can enforce this modification of the collective bargaining agreement, it must bargain collectively. . . . This obligation includes, of course, compliance with the four classes of section 8(d)." 453 F.2d 783, 787 (2d Cir. 1971).