**BERBIGLIA, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 78–1748.

United States Court of Appeals, Eighth Circuit.

Submitted March 14, 1979.

Decided Aug. 2, 1979.

---

Stephen P. Dees of Stinson, Mag & Fizzell, Kansas City, Mo. (argued), and Alvin D. Shapiro, Kansas City, Mo., on brief, for petitioner.

Stephen Mayer, Atty., N.L.R.B., Washington, D.C. (argued), Andrew F. Tranovich, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., on brief, for respondent.

Before BRIGHT and STEPHENSON, Circuit Judges, and BOGUE, District Judge.*

BRIGHT, Circuit Judge.

Berbiglia, Inc. (the Company), a Missouri corporation that operates twenty-two retail liquor stores in the Kansas City area, petitions this court to review and set aside an order of the National Labor Relations Board (the Board). That order directed the Company to offer reinstatement with backpay to three employees discharged in an effort to discourage activities on behalf of the Retail Store Employees Union, Local 782 (the Union).[1] The Board cross-petitions for enforcement of the order.

---

* ANDREW W. BOGUE, United States District Judge for the District of South Dakota, sitting by designation.

1. The Board found that in discharging the three employees the Company violated § 8(a)(1), (3) and (4) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3) and (4) (1976). The Board's decision is reported at 237 N.L.R.B. No. 18, 98 L.R.R.M. 1522 (1978).

■ An order of the Board cannot be set aside unless "the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951). The Board's findings of fact are conclusive "if [those findings are] supported by substantial evidence on the record considered as a whole[.]" 29 U.S.C. § 160(e) (1976). After carefully examining the record in light of those principles, we conclude that the Board's order must be enforced.

I. *The Discharges of Smith and Atchison.*

The discharges of John Smith and David Atchison occurred shortly after the end of an unfair labor practice strike against the Company in mid-1976.[2] Smith, a union activist who had worked for the Company for approximately ten years, served as a union strike captain during the 1976 strike.

In April 1976, at the outset of the strike, Atchison applied for and obtained a job as a sales clerk at one of the Company's stores. Jack Bondon, the president of the Company, told him that it would be a permanent position because the Company "didn't intend to take the union back." In early July 1976, during the strike, Atchison learned from his store manager, Douglas McKenzie, that the strikers would be returning to work on July 12, 1976, but that they would "be weeded out one by one, then we'll get good employees." McKenzie also informed Atchison that he would be paired with one of the returning strikers, Smith, and that he was not to discuss the Union or Company policies with Smith. If Smith spoke on those subjects, Atchison was to report the conversations to McKenzie.

On July 12, 1976, the strike ended as expected and Smith and the other strikers returned to work. Less than a month later, the Company discharged Smith as well as Atchison, allegedly for padding their commissions.[3] This occurred after store manager McKenzie examined the commission sheet of Smith and Atchison on August 4, 1976, and noticed that they had recorded "way too many" commissions for the previous two days. He immediately reported this to the Company, which promptly suspended Smith and Atchison pending an investigation. On the basis of that investigation, Company president Bondon concluded that Smith and Atchison had overestimated their commissions to such an extent that it could not have been a mistake.[4]

Although, as the Board found, the Company's manner of recording commissions invited abuse, the Company had never discharged anyone else for padding commissions. In fact, the Company on at least one occasion had failed to discipline a sales clerk for such practices. In August 1975, James Griffin, an employee of the Company for twenty-eight years, presented convincing evidence to his store manager, Ernie Snyder, that a fellow clerk, Dee Spencer, was overstating his commissions. Spencer's claimed commissions amounted to at least $50 more per week than those of the other clerks. Snyder agreed that the evidence disclosed misconduct by Spencer and reported this to the Company. However, higher echelon Company officials did not even question Spencer. Charles W. Saunders, Sr., the Company's vice president, claimed

---

2. In a separate proceeding, the Board sustained the Union's charges of unfair labor practices committed by the Company before, during, and at the conclusion of that strike. *Berbiglia, Inc.,* 233 N.L.R.B. No. 193, 97 L.R.R.M. 1369 (1977).

3. Sales clerks were entitled to commissions generally ranging from $.05 to $.30 on sales of certain brands and types of wine and liquor. Under the Company's honor system, the sales clerks kept track of their commissions by noting each eligible sale on a sheet of paper.

4. For the days in question, August 2–3, 1976, Smith reported commissions totalling $19.45, while Atchison claimed $18.50 in commissions. At the time of their discharge, Bondon knew that these figures were too high, but he did not know by how much. Later, in preparing for the hearing, he estimated that, based on their previous average commissions, each had overstated his commissions by about $13.

that he checked into the matter but "couldn't tie it down" because there were four men working at the store.[5] The following year, shortly after circulating a petition to decertify the Union, Spencer was promoted to store manager. Spencer remained in that position until his resignation in the fall of 1976 to take a management position with another company.

Following the discharges of Smith and Atchison, the Union brought unfair labor practice charges against the Company. After reviewing the evidence, the Board determined that in discharging these employees the Company had violated section 8(a)(3) and (1) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(3) and (1).[6]

■ The Company forcefully argues that the padding of commissions represented a valid ground for discharging Smith and Atchison. We agree. Moreover, we recognize that the cloak of unionism cannot protect an employee who commits illegal acts. As the Supreme Court stated in *NLRB v. Fansteel Corp.*, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed.2d 627 (1939), in setting aside a Board order reinstating employees discharged for engaging in an unlawful sitdown strike: "We are unable to conclude that Congress intended to compel employers to retain persons in their employ regardless of their unlawful conduct,—to invest those who go on strike with an immunity from discharge for acts of trespass or violence against the employer's property[.]" *Id.* at 255, 59 S.Ct. at 496. *See Iowa Beef Processors v. NLRB*, 567 F.2d 791 (8th Cir. 1977).

■ Nevertheless, " '[t]he mere existence of valid grounds for a discharge is no defense to a charge that the discharge was unlawful, unless the discharge was predicated solely on those grounds, and not by a desire to discourage union activity.' " *Singer Co. v. NLRB*, 429 F.2d 172, 179 (8th Cir. 1970), *quoting from NLRB v. Symons Mfg. Co.*, 328 F.2d 835, 837 (7th Cir. 1964). *See also R. J. Lallier Trucking v. NLRB*, 558 F.2d 1322, 1325 (8th Cir. 1977). Put another way, unlawful conduct that may justify the discharge of an employee does not permit the employer to use that unlawful conduct as a pretext for discrimination against members of the union. *See American Ship Building Co. v. NLRB*, 380 U.S. 300, 311–12, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). *Cf. McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 284 n. 14, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (Title VII case in which Court noted that *Fansteel* did not justify a discharge for unlawful activity if other employees, such as those of a different color, had not been discharged for the same activity); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (in Title VII action, employee is entitled to show that employer used employee's misconduct as a pretext for improperly motivated discharge).

■ The record in this case contains substantial evidence from which the Board reasonably could infer that the padding incident served merely as a pretext for discriminatorily motivated discharges. First, the Company's hostility toward the Union in mid-1976 was established in the previous Board proceedings. Such evidence is " 'proper and highly significant * * * for Board evaluation in determining mo-

---

**5.** When Spencer's padding continued into October 1975, Griffin, then the store manager, told Saunders, "I don't want somebody stealing as obvious as this guy is doing." Saunders replied, "Well, just have Jack or whoever is working with him keep watch on him at all times." When Griffin told him that that was impossible, Saunders said, "Well, we'll probably transfer him out one of these days."

**6.** That section provides in relevant part:

(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights [to form labor organizations, bargain collectively, and engage in other concerted activities for their mutual aid or protection];

\* \* \* \* \* \*

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization \* \* \*.

tive.'" *R. J. Lallier Trucking v. NLRB, supra,* 558 F.2d at 1325, *quoting from NLRB v. Superior Sales, Inc.,* 366 F.2d 229, 233 (8th Cir. 1966). Furthermore, this animus was ·confirmed when Bondon told Atchison in April 1976 that the Company "didn't intend to take the union back," and when McKenzie told Atchison in July 1976 that the returning strikers would "be weeded out one by one." In addition, Smith was a target of the Company, for McKenzie ordered Atchison to report to him if Smith spoke to him about the Union. Less than one month later, Smith and Atchison were discharged.

The key factor in this case, however, is the entirely different treatment accorded Spencer, the anti-union sales clerk, as compared to that given Smith and Atchison. The record fully supports the statement of the administrative law judge: "I fail to see any substantial difference in the suspicions concerning alleged padding by Spencer as compared to that of Atchison and Smith." The proof against Spencer was, if anything, stronger than that concerning Smith and Atchison. Moreover, although Spencer's padding apparently was long-term and netted him a considerable amount of money, Company officers failed to question him concerning the reports of his unusually large commission claims. On the contrary, the Company promoted Spencer to store manager. This stands in sharp contrast to the immediate suspension, investigation, and discharge of Smith and Atchison for a one-time offense from which they obtained at most $13 apiece.

■ The Company contends that, because it was unaware of Atchison's union status,[7] its discharge of both Atchison and Smith shows its even-handedness. The Board determined, however, that because Atchison collaborated in the padding incident seized

upon by the Company as a pretext for ridding itself of Smith, the Company needed to fire Atchison in order to mask its anti-union motive in Smith's discharge. Giving due deference to the inferences and credibility findings made by the administrative law judge, substantial evidence on the record as a whole supports this determination of the Board.

■ In sum, the disparity between the treatment of Smith and Atchison as compared to that of Spencer, combined with the Company's hostility to the Union, its expressed intention to weed out the strikers, and its focus on Smith, constitute substantial evidence supporting the Board's finding that Smith and Atchison were discharged to discourage union activities.[8]

## II. *Sinclair's Discharge.*

The remaining unfair labor practice charges before us concern Michael Sinclair, another union activist discharged a few months after the strike.

In November 1976, the Company refused to pay Sinclair for eleven hours' funeral leave taken when his grandfather had died. On January 18, 1977, the Union filed an unfair labor practice charge that, *inter alia,* referred to the denial of Sinclair's funeral leave request. Later that month, Sinclair submitted to the Board an affidavit in support of the Union's charge.

■ In early February 1977, Company vice president Saunders visited Sinclair's store and suggested that Sinclair should discuss his problems with him rather than taking them to the Union representative. About a week later, Sinclair was discharged, allegedly for being discourteous to a customer.

---

**7.** Atchison joined the Union two days prior to his suspension for padding, but there is no evidence that the Company knew of this affiliation.

**8.** In ordinary circumstances, evidence of an underlying anti-union animus, however strong, cannot overcome an employer's demonstration

that compelling reasons for discharging an employee, such as an apparent act of dishonesty towards the employer in a retail business, exist. Here, however, the convincing evidence of disparate treatment of union and anti-union employees furnishes the keystone for the arch of the Board's case.

■ The Board determined that the Company violated sections 8(a)(3), (4),[9] and (1) of the Act by discharging Sinclair because of his union activities and his funeral leave complaint, and violated section 8(a)(1) by encouraging Sinclair to deal directly with the Company concerning grievances instead of going through the Union.

The Company's discharge of Sinclair rests on far less substantial grounds than the discharges of Smith and Atchison. Sinclair's good work record with the Company, the weak quality of the evidence of his discourteous conduct, the Company's superficial investigation of that incident, and the Company's abiding desire to weed out the strikers furnish an ample basis for an inference that the Company seized upon the discourtesy incident as a pretext to conceal its anti-union motive. Because Sinclair's funeral leave complaint provided part of the motivation for his discharge, we uphold the Board's determination that the Company violated not only section 8(a)(3) of the Act, but also section 8(a)(4).

In addition, substantial evidence supports the Board's finding of a section 8(a)(1) violation. "The test is whether the employer engaged in conduct which reasonably tends to interfere with, restrain, or coerce employees in the free exercise of their rights under section 7." *Russell Stover Candies, Inc. v. NLRB*, 551 F.2d 204, 208 (8th Cir. 1977). Saunders' suggestion that Sinclair present his problems to him rather than to the Union meets this test.

Accordingly, we enforce the Board's order in full.

---

9. Section 8(a)(4) makes it an unfair labor practice for an employer "to discharge or otherwise discriminate against an employee because he has filed charges or given testimony [concerning unfair labor practices.]" 29 U.S.C. § 158(a)(4).