NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION, LOCAL 6–578, AFL–CIO, Respondent.

No. 79–1190.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 3, 1979.

Decided March 13, 1980.

Lafe Solomon, Atty., N.L.R.B., Washington, D.C., for petitioner; John G. Elligers, Jesse I. Etelson, Attys., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., on brief.

Francis X. Helgesen, Peterson, Engverg & Peterson, Minneapolis, Minn., for respondent; Stephanie M. Helgesen, Minneapolis, Minn., on brief.

Before HEANEY, BRIGHT and ROSS, Circuit Judges.

ROSS, Circuit Judge.

This case comes before us on a petition for enforcement of an order of the National Labor Relations Board pursuant to 29 U.S.C. § 160(e). In its Decision and Order of September 29, 1978,[1] the Board determined that the respondent, Oil, Chemical and Atomic Workers International Union, Local 6–578, violated Section 8(b)(1)(A) of the National Labor Relations Act[2] by initiating disciplinary proceedings against employees who had resigned from the union and crossed a legal picket line to return to work. The union's filing of charges against several former members and the sending of letters notifying these nonmember employees of the charges brought against them were deemed by the Board to be an unfair labor practice within the meaning of the statute. These actions specifically were found restrictive and coercive of the nonmembers' right to refrain from union activities, which is guaranteed by section 7 of the Act.[3]

In reviewing this Decision and Order, we are called upon to consider the question of whether the filing of written charges against these employees who had resigned from the union and the sending of notification of those charges, standing alone, constitute the type of unfair labor union practice which Congress intended to prohibit by enacting section 8(b)(1).

Although some of the critical factual matters in this appeal are disputed, the factual determinations adopted by the Board provide the background information necessary for this inquiry. On October 4, 1977, the Amalgamated Meat Cutters Local B–9 struck several grocery stores owned by Gordy's, Inc., including the store in Austin, Minnesota. Although all of the unions members in Austin originally honored the picket line, seven employees submitted resignations at various points in time and returned to work. In six of these seven instances, the crossing of the union's picket line prompted a union official to file the written disciplinary charges which are the subject of this litigation.

---

1. 238 N.L.R.B. 172 (1978).

2. 29 U.S.C. § 158(b)(1)(A) reads as follows:

 (b) It shall be an unfair labor practice for a labor organization or its agents—
 (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; or (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances;

3. 29 U.S.C. § 157 reads as follows:

 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

Employees David Nordby and Jeff Nauman testified that on October 4, the first day of the strike, they accompanied Loren Day to the union's business office. Nordby stated to the union's business manager, Mrs. Betty Thomas, that he wished to withdraw from the union and return to his job because he needed the money. The three employees were told to see her later in the day in her office. When they returned, each employee had a letter of resignation in hand, and asked to resign from the union. Mrs. Thomas refused to accept the resignations and added that fines of up to five hundred dollars could be assessed for crossing a picket line. Loren Day handed over his letter of resignation anyway, and left. No charges were filed against him, and for that reason his name is not included in the complaints. Nauman and Nordby left without resigning.

The Administrative Law Judge, Bernard Ries, credited the testimony of Nauman and Nordby in determining that the meetings focused on the employees' desire to resign from the union, rather than to temporarily withdraw, as Mrs. Thomas' testimony indicated. Furthermore, David Nordby testified that he related portions of Mrs. Thomas' comments to George Kuth, Randall Hillson and Kirk Handahl, who subsequently resigned from the union and returned to work.

On October 10, Kathy Weber sent a certified letter of resignation to the union, and she returned to work the following day. Mrs. Thomas sent her a letter informing her that she had been charged with a violation of the union's constitution for crossing the picket line. Before receiving the letter, however, Ms. Weber called Mrs. Thomas and asked if she could rescind her resignation, and promised that she would not cross the picket line again. Mrs. Thomas informed her that she would be accepted back into the union, and advised her to throw the letter away. When the notification letter came, she threw it away without reading it. The Administrative Law Judge found no union coercion of Ms. Weber since she had not read the charges.

On October 17, an envelope containing Nauman's, Hillson's and Rodney Walker's resignations was mailed from the Austin post office, and these three employees crossed the picket line to return to work later that day. Charges were filed by the union and letters were mailed to each of them informing them of the disciplinary action. The union claims that these resignations were never received.

On October 25, employees George Kuth and Kirk Handahl sent their letters of resignation to the union via certified mail. They returned to work the following day and received letters from the union a few days later which were identical to those received by the other employees.

The original complaint charging the union with unfair labor practices listed violations pertaining only to the union's dealings with Weber, Kuth and Handahl. The complaint was amended, however, to include the names of Nauman, Hillson and Walker. The union challenged that amendment because it is their position that these employees' resignations were never received. A second amended complaint was subsequently filed altering the theory upon which the alleged unfair labor practices were based.

The original complaint alleged that the union had coerced and restrained the named employees "by charging the individuals named below with violation of the Constitution of Respondent's International Union for crossing a picket line at the Employer * * *, notwithstanding the fact that each of said employees had resigned their membership from the Respondent prior to crossing the picket line." The second amended complaint alleged that the coercion and restriction resulted from "charging the individuals named below with violation of the Constitution of Respondent's International Union and by threatening to fine employees for crossing a picket line at the Employer on the dates set forth below, notwithstanding the fact that each of said employees had resigned their membership from the Respondent prior to crossing the picket line."

Judge Ries noted that there was some confusion as to whether the second amend-

ed complaint was to be interpreted so that an unfair labor practice could be established either by the filing of written charges *or* by proving Mrs. Thomas' threats, or whether both elements had to be established to prove a violation. If only the latter theory were correct, a violation of the Act could only be established as to the union's treatment of Jeffrey Nauman. He received a letter from Mrs. Thomas and in addition was the only one among the employees listed in the complaint who was actually present when the threatening statements were made. After carefully reviewing the case law in this area, Judge Ries concluded that the latter theory was too restrictive, and adopted the theory that "the filing of charges and notification thereof itself has a restraining and coercive effect, despite the absence of the communication to the charged employees of the specific consequences which may attach * * *." The Board adopted Judge Ries' conclusions.

We will consider first the ultimate issue in this case of whether the filing and notification of charges stemming from the employees' post resignation conduct constitutes an unfair labor practice under the terms of the Act. We will then turn our attention to the factual determinations adopted by the Board to establish whether substantial evidence in the record supports the conclusion that each individual employee returned to work after the union received his or her resignation.

## I. The Unfair Labor Practice

Although the union disagrees with Judge Ries' conclusion, they are in substantial agreement with his framing of the issue in this case. They, too, adopt the theory of the original complaint, and urge this court to consider only the filing of charges and notification thereof in determining whether a violation of the Act has occurred. They challenge the second amended complaint, which added Mrs. Thomas' allegedly threatening statements as grounds for finding a violation, because it allegedly came too late in the proceedings and it erroneously characterized Mrs. Thomas' statements as

threats. By attempting to exclude Mrs. Thomas' statements from our inquiry, the union narrows the issue down to one of whether the union engaged in an unfair labor practice simply by filing written charges against the employees and notifying them of those charges in accordance with duties set forth in their International Constitution. And their answer to this question, of course, is "no."

The Board's review of the applicable case law surrounding this area also left them satisfied with the theory of the original complaint. The Board, however, reached the conclusion that the union committed an unfair labor practice simply by filing the charges against the nonmember employees and notifying them of the same, and that any consideration of other allegedly threatening or coercive statements or activities was unnecessary for proving such a violation. We have carefully analyzed this difficult issue and we conclude that the Board was correct in holding that the union's activities in filing the charges and sending the letters were coercive and restrictive, and that a violation of the Act has occurred. We believe, however, that the threats of Mrs. Thomas, made to Nauman and communicated by Nordby to Kuth, Hillson and Handahl, could have properly been considered by the Administrative Law Judge in reaching his conclusion.

In opposition to our enforcement of the Board's Decision and Order of September 29, 1978, the union first argues that its members should be given an opportunity to judge for themselves, through their internal proceedings, the question of whether or not each employee's resignation was received prior to his or her crossing of the picket line. The union claims that the National Labor Relations Act gives them the authority to administer all matters of this nature which relate to the retention of their membership. We are convinced, however, that the union's authority to discipline these employees ended when their resignations were received.

We are fully aware that the authority of a labor organization to discipline persons

who cross a legal picket line while maintaining "full union membership" was upheld by the Supreme Court in *NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 195–96, 87 S.Ct. 2001, 2014–15, 18 L.Ed.2d 1123 (1967). In that case, the Court held that a union's authority to regulate its *internal* affairs is derived from the proviso to section (b)(1)(A) which states that the prohibition against unfair labor activity "shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein." The questions we are faced with, however, are whether or not this authority may be extended to affect the activities of those who have legally ended their membership relationship with the union, and whether the union's attempt to so extend their authority unduly restricts an employee's section 7 right to refrain from union activities.

The distinction drawn by the Court in *NLRB v. Allis-Chalmers Mfg. Co., supra,* between the union's statutory authority over the regulation of purely internal affairs and the national labor policy which prohibits a union from engaging in unfair labor practices was discussed again in *Scofield v. NLRB*, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969). The Court there recognized that so long as an employee is a member of the union, he is subject to that union's internal rules. But in recognition of the fact that this authority is limited to internal matters concerning a union's *current* members, the Court stated that "[u]nder this dual approach, § 8(b)(1) leaves a union free to enforce a properly adopted rule which reflects a legitimate union interest, impairs no policy Congress has imbedded in the labor laws, and is *reasonably enforced against union members who are free to leave the union and escape the rule.*" *Id.* at 430, 89 S.Ct. at 1158. (Emphasis supplied.)

**4.** See *NLRB v. Machinists Local 1327, Int'l Ass'n of Machinists and Aerospace Workers, AFL–CIO, District Lodge 115*, 102 L.R.R.M. 2583 (9th Cir. 1979).

**5.** Although the resignations of the employees were not in conformity with the procedure laid

Against this background, courts have been reluctant to extend a union's internal authority to include control over individuals who are not members of the union, or who have resigned from the union. In *Booster Lodge No. 405, Int'l Ass'n of Machinists v. NLRB*, 148 U.S.App.D.C. 119, 459 F.2d 1143 (D.C.Cir.1972), *aff'd*, 412 U.S. 84, 93 S.Ct. 1961, 36 L.Ed.2d 764 (1973) (per curiam), where union members resigned and crossed a legal picket line to return to work, the court held that the union had no authority to impose fines on these individuals. The court stated that:

It is, therefore, obvious that *membership* in the labor organization is the *sine qua non* to the authority of a union to impose disciplinary burdens upon the employees it represents. This has been widely recognized.

\* \* \* \* \* \*

It is therefore apparent that *Booster Lodge 405 only had the authority to discipline those employees who were in fact Union members at the time they engaged in the complained of activity.*

148 U.S.App.D.C. at 127, 459 F.2d at 1151. (Emphasis in original.)

 We agree that, as a general proposition, a union's authority to discipline a member terminates when that person validly resigns from the union. But other factors enter into our decision as well. In the present case, the union's International Constitution contains no express provision which purports to limit an employee's post resignation conduct.[4] Nor have the employees in this action entered into any agreement with the union which would obligate them to refrain from crossing the picket line. Furthermore, the union does not raise any issue as to the validity of any of the resignations.[5] Finally, it is clear from a

out in the union's International Constitution, the union has not raised the issue at any point in the proceedings. Under the constitution, an employee may file a letter of resignation only during the ten day period which immediately precedes his or her annual anniversary of membership. Judge Ries found that this procedure

reading of the union's International Constitution that the disciplinary sanctions which may be imposed by a local chapter are directed towards *officers or members* only.[6] Under these circumstances, we feel that our disposition of this case is controlled by the principles enunciated by the Supreme Court in their affirmance of *Booster Lodge No. 405, Int'l Ass'n of Machinists v. NLRB, supra,* 412 U.S. at 89–90, 93 S.Ct. at 1964–1965 (footnote omitted):

> The provision in the Union's constitution which proscribes strikebreaking by its terms purports only to define "misconduct of a member." Nothing in the record indicates that Union members were informed, prior to the bringing of the charges that were the basis of this action, that the provision was interpreted as imposing any obligation on a resignee. Thus, in order to sustain the Union's position, we would first have to find, contrary to the determination of the Board and of the Court of Appeals, that the Union constitution by implication extended its sanctions to nonmembers, and then further conclude that such sanctions were consistent with the Act. But we are no more disposed to find an implied post-resignation commitment from the strikebreaking proscription in the Union's constitution here than we were to find it from the employees' participation in the strike vote and ratification of penalties in *Textile Workers.*[7]

We are similarly indisposed to find an implied post resignation commitment to refrain from strikebreaking in the union's International Constitution in the present case. We are also unwilling to extend the union's disciplinary authority to encompass the activities of employees who have resigned from the organization. Any other conclusion would unduly elevate the union's internal authority to a position of dominance over the individual's section 7 right to refrain from union activity. We see no reason why a union should have such an implied right to impose restrictions on an employee's post resignation conduct. As the Supreme Court pointed out in *Scofield v. NLRB, supra,* 394 U.S. at 430, 89 S.Ct. at 1158, the authority of a union over its internal affairs gains its legitimacy in part from the fact that members are free to leave the union and escape the effect of its rules. Thus, the right of an individual to freely exercise his or her right of association *or* disassociation with a labor organization under section 7 occupies such an important position in our national labor policy that it "militates against the imposition of such an implied obligation" as the union urges us to adopt today. *Booster Lodge No. 405 Int'l Ass'n of Machinists v. NLRB, supra,* 148 U.S.App.D.C. at 129–30, 459 F.2d at 1152–53.

Finally, the union strongly contends that even without such authority, the mere filing of charges against nonmembers and the notification thereof are not coercive and restrictive acts, and that therefore no violation of the Act has occurred. We are urged to hold that simply because no fines or disciplinary measures beyond the filing and notification have been issued or instituted, the employees who received notification of the written charges have not been coerced or restricted in the exercise of their section 7 rights. We cannot accept this rationale.

---

did not "provide the sort of 'reasonable accommodation' between the conflicting interests which the Board conceives of as minimally required" by *Local 1384, United Automobile, Aerospace and Agricultural Implement Workers, UAW (Ex-Cell-O Corp.),* 227 N.L.R.B. 1045, 1051; 94 L.R.R.M. 1145.

**6.** Article XII of the International Constitution (Discipline) reads, in part, as follows:

> Section 1. Neglect of duty or breaches of International or Local constitutions, laws or rules by officers or members, may be punished by reprimand or fine (not to exceed a reasonable amount for each offense) at the will of a majority, or by suspension or expulsion at the will of three-fourths of the members in good standing of his Local Union voting thereon after trial in accordance with the Local and International Constitution, unless the penalty is prescribed otherwise by such Constitutions.

**7.** *NLRB v. Granite State Joint Board, Textile Workers Union of America, Local 1029 AFL–CIO,* 409 U.S. 213, 93 S.Ct. 385, 34 L.Ed.2d 422 (1973).

Admittedly, we are dealing with less union pressure than was the subject of debate in *Booster Lodge*, where the union sought court enforcement of fines imposed for strikebreaking activity. Nevertheless, we are convinced that the activities engaged in by the union were sufficient to constitute a violation of the Act. In the first place, the union's International Constitution clearly indicates that a *member* who has violated the constitution may be punished by reprimand, *fine*, suspension, or expulsion.[8] The threat of a fine is thus inherent in the union's filing of the charges, and such a threat is coercive. In addition, an examination of the union's constitution shows that the filing of charges is more than a mere accusation. It is only the beginning of the union's internal disciplinary proceedings, including a hearing before the full membership of the chapter to determine whether a trial is warranted, a possible referral to the Investigating Committee, a committee report to a regular or special meeting of the full membership, and then a vote. In the event that a conviction is obtained, there exists the possibility of an appeal to the Executive Board of the International Union and another possible appeal to the first Convention of the International Union. A reading of these provisions is enough to convince any reasonable person that the union's filing of written charges is serious business.

Thus, the filing of written charges against a person who has resigned from a union not only exceeds that organization's authority, but as a practical matter, also communicates a threat to that person for exercising his or her statutory right to refrain from union activities. We therefore hold that the notification of a person who has legally resigned from a union that written charges have been filed against him or her constitutes a coercive and restrictive labor practice in violation of § 8(b)(1)(A). *See NLRB v. Communication Workers of America, AFL–CIO, Local 1170*, 474 F.2d 778, 782 (2d Cir. 1972).

## II. The Board's Factual Determinations

■ We now turn our attention to a review of the evidence in this case which supports the Board's determination that the resignations of the employees were received by the union prior to the time each of them crossed the picket line. The union claims that the resignations of Nauman, Walker and Hillson were not received at all, and that therefore the filing of charges against them and the subsequent notification of those charges were valid exercises of their authority. We disagree. The Board's findings of fact are to be considered conclusive if they are supported by substantial evidence in the record as a whole. *Berbiglia, Inc. v. NLRB*, 602 F.2d 839, 842 (8th Cir. 1979). We have reviewed the entire record, including the transcript of the proceedings before Judge Ries, and we are convinced. that there is substantial evidence in the record to support the Board's finding that each employee resigned before crossing the picket line. We will summarize that evidence below.

*Jeffrey Nauman, Randall Hillson and Rodney Walker*

These three employees testified that they each wrote letters of resignation on October 16, 1977, and dated them October 17. They also testified that the letters were placed in the same envelope on October 17, and were mailed by Hillson at 8:00 on that morning. The testimony of three postal employees—a window clerk, a collection and delivery foreman and a special delivery carrier—established a chain of custody of the envelope. Their testimony confirms that the envelope first came into the possession of the postal service at approximately 8:00–8:30 on the morning of the 17th, and was delivered to the man who normally accepts the union's mail in the building occupied by the union sometime between 8:30 and 9:00 on that same morning. Nauman and Hillson testified that they returned to work at 11:45 a. m. on the 17th, and Walker stated that he returned to work at 4:10 that afternoon.

8. *See* note 6, *supra*.

The testimony of these former union members and postal employees did not, of course, go uncontroverted by the union's witnesses. But the credibility to be afforded their testimony is within the sound discretion of the trier of facts, and should be reversed only in "extraordinary circumstances." *NLRB v. Penzel Construction Co.*, 449 F.2d 148, 149 (8th Cir. 1971). The clarity of the testimony of the former union members and the postal employees is evident from our review of the transcript, and it is clear that such extraordinary circumstances do not exist in this case. We therefore hold that there is substantial evidence to support the finding that these three employees resigned before returning to work.

### George Kuth and Kirk Handahl

Kuth and Handahl testified that their letters of resignation were mailed to the union at 8:00 a. m. on October 25, in the same envelope. The union's counsel offered into evidence the receipt for the certified letter which was signed by Mrs. Thomas at 4:20 that afternoon. The union's counsel also stipulated that Handahl's letter of resignation was contained in the envelope along with Kuth's. Both employees testified that they crossed the picket line on October 26, one day after the resignations admittedly were received. There is therefore sufficient evidence in the record to support the conclusion that these two employees resigned before crossing the picket line.

### Kathy Weber

The Board held that the union did not violate the Act by filing charges against Kathy Weber because she never read the letter notifying her of the disciplinary action. We are not urged to adopt a contrary position, and do not do so.

### III. Conclusion

In accordance with the foregoing analysis, we conclude that the Board's factual finding that Nauman, Hillson, Walker, Kuth and Handahl all submitted valid resignations to the union prior to crossing the picket line must be upheld. We further conclude that the union's filing of charges against these former members for crossing a picket line and the subsequent notification of those charges constituted an unfair labor practice within the meaning of the National Labor Relations Act. We therefore order that the Board's Decision and Order of September 29, 1978 be, and hereby is, enforced.

HEANEY, Circuit Judge, dissenting.

I respectfully dissent.

The five persons who resigned from the local union were notified by letter that charges had been filed against them. There was no statement in the letter that sanctions would be imposed by the union disciplinary committee hearing the charges. Under the union constitution, the disciplinary committee could impose a reprimand, a fine, a suspension or an expulsion. Since expulsion or suspension are lawful penalties under § 8(b)(1)(A) of the National Labor Relations Act, 29 U.S.C. § 158(b)(1)(A), *N.L.R.B. v. District Lodge No. 99*, 489 F.2d 769 (1st Cir. 1974); *Local 1255, Int. Ass'n of Mach. & Aero. Wkrs. v. N.L.R.B.*, 456 F.2d 1214 (5th Cir. 1972); *Pattern Makers' Ass'n of Los Angeles (Lietzau Pattern Co.)*, 199 N.L.R.B. 96, 81 L.R.R.M. 1177 (1972), neither the National Labor Relations Board nor this Court has a right to assume that the union would impose unlawful fines on the employees. Moreover, an employee's resignation from a union is not effective until it is received by the union. *Local 1012, United Electrical, Radio & Machine Workers (General Electric Co.)*, 187 N.L.R.B. 375, 76 L.R.R.M. 1038 (1970).

Until a resignation is effective, a union may lawfully fine and discipline members who cross its picket line. A disciplinary charge is nothing more than a charge. The view adopted by the Board and the majority deprives a union of any opportunity to determine whether the resignation was effective and assumes that the union will not determine this question honestly and fairly. By holding that the filing of a charge is violative of § 8(b)(1)(A), one necessarily assumes that a union disciplinary committee will not recognize the effectiveness of a

resignation even if the resignation was timely. Neither the Board nor this Court has a right to make such an assumption.

The cases relied on by the Board to support its claim that the filing of charges was violative of the Act are not persuasive. In *Local Union No. 13, United Ass'n of Plumbers and Pipefitters (Mechanical Contractors Ass'n)*, 212 N.L.R.B. 477, 87 L.R.R.M. 1249 (1974); *International Brotherhood of Electrical Workers, Local 34 (Protection Alarms, Inc.)*, 208 N.L.R.B. 639, 85 L.R.R.M. 1351 (1974); *Penzel Construction Co., Inc. (Carpenters Local 1770)*, 185 N.L.R.B. 544, 75 L.R.R.M. 1051 (1970), the Board found violations of § 8(b)(1)(A) based on a threatened or actual filing of charges against members. In each case, however, the charges were filed in response to a member bringing an unfair labor practice charge or giving damaging testimony against the union to the Board.[1] The curtailment of employee access to Board proceedings and protection impairs the national labor policy and involves more than the internal affairs of a union. *Scofield v. N.L.R.B.*, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969); *N.L.R.B. v. Shipbuilding Local 22*, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968).

The Board also cites *Communications Workers of America, Local 1122 (New York Tele. Co.)*, 226 N.L.R.B. 97, 93 L.R.R.M. 1161 (1976); *Communications Workers of America, Local 1170 (Rochester Tele. Corp.)*, 194 N.L.R.B. 144, 79 L.R.R.M. 1113 (1972), in support of its holding here. Neither case is on point. Both cases involved charges against an employee for violation of a union rule found by the Board to be unlawful under § 8(d) and § 8(b)(3) of the Act. In the latter case, the enforcing Court noted that the charge did not stem from a violation of a lawful union rule dealing with a purely internal matter. *N.L.R.B. v. Communications Workers of Amer., Local 1170*, 474 F.2d 778, 782 (2d Cir. 1972), *enforcing Communications Workers of America, Local 1170 (Rochester Tele. Corp.)*, *supra*.

The Board is establishing a mischievous precedent by holding that simply preferring charges against a "recently resigned member" for crossing a picket line is coercive within the meaning of the Act, and this Court is compounding the mischief by agreeing with it.

---

1. Similarly, in *United Steelworkers of America, Local Union 5550 (Redfield Co.)*, 223 N.L.R.B. 854, 92 L.R.R.M. 1062 (1976), the disciplinary proceedings were threatened when a member indicated that he was about to testify against a union at an arbitration proceeding.