**TREY PACKING, INC., Gol-Pack Corporation, National Frosted Food Co., Inc., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 193–196, Dockets 32559–32561, 32713.**

United States Court of Appeals Second Circuit.

Argued Nov. 20, 1968.

Decided Dec. 11, 1968.

Certiorari Denied March 24, 1969. See 89 S.Ct. 1191.

John J. Bracken, Bracken & Walsh, Newark, N. J., for petitioners.

Glen M. Bendixsen, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, William J. Avrutis, Edward E. Wall, Washington, D. C.), for respondent.

Before KAUFMAN and ANDERSON, Circuit Judges, and TENNEY, District Judge.*

KAUFMAN, Circuit Judge:

This case is here on a petition of Trey Packing, Inc. (hereinafter referred to as the Company)[1] for review of the National Labor Relations Board's order of June 26, 1968.[2] The Board has cross-petitioned for enforcement of the order.

The Trial Examiner found, after a hearing, that the Company had violated § 8(a) (5) of the National Labor Relations Act by refusing to bargain with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No. 182 (hereinafter referred to as the Union), § 8 (a) (1) of the Act by interrogating its employees concerning their union activities, threatening them with reprisals for union activities and promising them benefits for refraining from union activity, and § 8(a) (3) by discharging two of its employees for union activity. The Board adopted the findings and conclusions of the Trial Examiner and ordered the Company to cease and desist from its unfair labor practices, to bargain with the Union, to reinstate the discharged employees in their former positions at its Oneida plant and reimburse them for any losses suffered as a result of the discriminatory discharges, and to post the usual notices. For the reasons below, we deny the Company's petition for review and grant the Board's cross-petition for enforcement of its order.

I.

Trey Packing, Inc. is a New York corporation, with its principal place of business in Oneida, New York, where it is engaged in the processing, manufacture, sale and distribution of meat and meat products. At the time of the events in question, the Company employed at its Oneida plant five truckdrivers to make its pickups and deliveries, four of whom were over-the-road drivers while the fifth was a combination warehouseman-

---

* Of the Southern District of New York, sitting by designation.

1. Gol-Pack Corporation and National Frosted Food Co., Inc. were also named as respondents before the Board. Joseph Goldwasser is president of all three corporations, and the Board referred to all three collectively as the employer. However, since Trey Packing is the only one of the three companies involved in the al- leged unfair labor practices under consideration, we shall confine our discussion to it alone.

2. Since it is undisputed that Trey Packing is engaged in commerce within the meaning of the Act, and that the alleged unfair labor practices occurred at Oneida, New York, the Company's principal place of business, there is no question as to the court's jurisdiction.

driver. In early June of 1967, one of the Company's drivers, Robert Hughes, telephoned L. Frank Parks, assistant business agent for the Union, and informed him that the drivers were interested in having the Union represent them. On June 10, all four of the Company's over-the-road drivers met and signed union authorization cards.[3] The Union then sent the Company a letter, which it received on June 14, stating that "the drivers at your Oneida, New York branch have become paid up members of the Teamsters Local No. 182," and requesting that the Company make arrangements to bargain with it. The Company failed to respond to this letter.

About June 17, William Trexler, one of the Company's drivers, went to see Lawrence Goldwasser, the secretary of the Company, and son of its president, concerning another matter. During the course of the conversation, Trexler asked Goldwasser how he felt about the Union. According to Trexler's testimony, which the Trial Examiner found credible, he stated to Goldwasser, " * * * as you probably know, we joined the union," to which Goldwasser responded that he would like to know why the men took this step. He went on to state that matters of dissatisfaction could have been worked out without the Union, and asked Trexler which of the employees had signed cards. Trexler answered that "all four drivers" had signed and given the cards to Parks. Goldwasser said in response that if the Union were chosen as the employees' bargaining representative, its demands would be so high that in the future he would not be able to afford to let the men work 40 hours a week as had been their custom, and that he would no longer be able to talk to them "man to man." A few days later, Goldwasser advised Trexler that if the Union became the employees' representative, the Company could ship by "gypsy" drivers and lay off some of the workers.

Trexler also testified that he had another conversation with Goldwasser on Friday, June 23, at which time he asked Goldwasser to speak to the drivers and to convey to them directly his feelings about the Union. Goldwasser replied that he could not, but asked Trexler to do so in his behalf, and to inform the men that if they withdrew from the Union, "things would be as * * * before." Goldwasser went on to say that his father had started trucking out of Oneida as an experiment, and that if the men persisted in unionizing, he might discontinue the operation and dismiss the drivers. He further commented that the Company had originally moved to Oneida to get away from the Union. The conversation concluded with Goldwasser's request that Trexler should "see what [he] can do," and advise Goldwasser of the men's decision at their forthcoming meeting.[4]

The following day, Trexler went to the home of John Wands, the Company's plant manager, and told him about the meeting he was planning at Goldwasser's suggestion. According to Trexler, Wands stated that he had been instructed not to talk to the drivers about the Union, but he nevertheless went on to say that the Union would not be successful, and that if it were, the men would not be driving any longer for the Company.

On Monday, June 26, Trexler met Goldwasser again. At that time, in response to Goldwasser's questions, Trexler told him that the employees had decided not to withdraw from the Union. When Goldwasser asked which of the drivers refused to withdraw, Trexler named Robert Robinson and Robert Hughes. About an hour after this conversation, Gold-

3. These cards stated: "I * * * hereby authorize the representatives of the Teamsters, Chauffeurs, Warehousemen and Helpers, Local 182, to represent me and, in my behalf to negotiate and conclude all agreements as to hours of labor, wages, and other employment conditions."

4. According to Goldwasser's version concerning this discussion, after he told Trexler that he opposed the Union, Trexler said, "I didn't know you felt that way. I may reevaluate the situation."

wasser summoned these two men to his office and told them that they were being laid off, giving each a letter stating that the reason for this action was "[a] decrease in the transportation of our products and the products of other companies with which we deal." Goldwasser further advised the men that the layoff was to take effect immediately, and that they should not finish unloading the truck then in process.

Another of the drivers, Donald Baker, testified that on June 22, Wands telephoned and asked him to meet Wands the following morning. At this meeting, Wands also asked about the grievances of the drivers, stated that the Company could be helpful without the Union and that the Union "was a crook" and could be bought off. He then inquired if Baker intended to remain with the Union, to which Baker replied that he was undecided. Wands then declared that if the employees dropped out of the Union they would keep their jobs, but that if they did not, the Company could ship by common carrier as it had before and would lay off some employees. Baker also testified that he spoke with Goldwasser on or about July 5, at which time Goldwasser told him that there would be an increase in pay in early August, and that if he did not join the Union he could have a job working on the inside of the plant, as Baker had previously requested.

Ruth Trexler, the driver's wife, testified that Wands told her that Hughes and Robinson had been given a chance to drop out of the Union (at this time they had already been discharged), that her husband would have a job as long as he remained loyal to the Company, and that if Baker did not drop out of the Union, he would get the same treatment as Hughes and Robinson.

## II.

Based upon the testimony briefly set forth above, the Board found that the Company had violated § 8(a) (1) by threats of reprisals, promises of benefits, interrogation of individual employees, and requesting an employee to solicit other employees to withdraw from the Union, all of which infringed upon the free exercise of the right of self-organization guaranteed the employees by § 7 of the Act. More specifically, the reprisals threatened including cutting down or discontinuing the trucking operations and using instead common carriers or gypsy drivers, reducing the working hours of the drivers, and discharging those drivers who joined the Union; the benefits promised included satisfaction of the employees' grievances about working conditions, a raise in pay in August, and for Baker, a transfer to the job which he had requested.

The Company argues in defense (1) that Trexler's testimony was not credible, (2) that Goldwasser's speech was protected under the Act, and in any case was not illegal because it was procured by entrapment, and (3) that Wands' statements cannot be attributed to the employer because they were unauthorized.

 As to the credibility of Trexler's testimony, it is sufficient for us to note that, based upon his observations of the witness, the Trial Examiner specifically found Trexler to be "a credible witness who was telling the truth." The Trial Examiner's findings of credibility cannot be ignored by us when we consider whether the Board's findings of fact were supported by substantial evidence. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 493, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Moreover, our reading of Trexler's testimony does not reveal those egregious inconsistencies which the Company argues indicate that he was lying; rather his progressive inclusion of greater detail in response to questioning suggests to us, as it did to the Trial Examiner, merely that he needed to have his memory refreshed as to details of events which had occurred many months earlier. Finally, we note that Lawrence Goldwasser did not specifically refute any of the statements attributed to him by Trexler, but simply denied in general terms having made any threats or promises. And to the extent

that the testimony of the two did conflict, we believe that the Trial Examiner, having observed the demeanor of each, was justified in choosing to believe Trexler rather than Goldwasser. Accordingly, we are of the view that the Board's findings were supported by substantial evidence on the record as a whole. See Universal Camera Corp. v. N. L. R. B., supra.

■ The Company also argues that Goldwasser's statements were protected under the Act. We find little merit to this. Section 8(c) which protects the right to express "views, argument, or opinion," specifically excludes from its scope such expressions which contain threats of reprisals or promises of benefits. Moreover, the Company's claim that Trexler entrapped Goldwasser into making the statements is entirely ephemeral in this case. Even if entrapment might in some other circumstances be a valid defense to an unfair labor practice charge, a question as to which we express no opinion, we can by no stretch of the imagination consider Trexler to have been an agent of the government while he was discussing the Union with Goldwasser and Wands, as the law of entrapment would require. If more is needed, we note that in light of the Company's other illegal conduct discussed below, we cannot attach great weight to its argumen that but for Trexler's inducement, Goldwasser would not have been likely to engage in the faulted conduct.

■■ Finally, the Company contends that Wands' statements should not have been attributed to it because the president of the Company had told him, as he revealed to Trexler, that he should not talk to the drivers about the Union. The general rule is that an employer will be charged with responsibility for the acts of his supervisory employees when its employees would have just cause for believing that he was acting on behalf of the company. Irving Air Chute Co. v. N. L. R. B., 350 F.2d 176, 179 (2d Cir. 1965). Accordingly, the statements which Wands made to Trexler, considered *in vacuo*, would not be attributable to the Company, since Trexler testified that Wands had told him that he was instructed not to make any statements concerning the Union. But when Wands' statements to Trexler are considered in the context of the Company's other actions, we believe they are fairly attributable to it, since at about the same time Wands made his threats and promises, Goldwasser, who was clearly speaking for the Company, was making similar threats and promises and then actually carried through by discharging Hughes and Robinson for Union activity. Thus, although Trexler was told that Wands should not be speaking with him, we believe that based on all the events which were occurring almost simultaneously, he had good reason for believing that Wands was really voicing firm Company policy when he spoke to the issues. The statements Wands made to Baker are clearly on a different footing. There is no evidence that Baker was ever told that Wands lacked authorization. Accordingly, we believe that the Board's finding of § 8(a) (1) violations were amply supported by the evidence, and we affirm.

### III.

The Company insists that its action in discharging Robinson and Hughes was not motivated by anti-union animus, but by valid economic considerations. In particular, it maintains that it dismissed the two men because, due to numerous breakdowns, trucking operations out of Oneida had proved too costly and it had decided instead to make deliveries to its customers out of warehouses in Quincy, Massachusetts, and Secaucus, New Jersey, thus reducing the number of drivers needed in Oneida. The Trial Examiner and the Board rejected this explanation for several very cogent reasons. First, when asked about the number of truck breakdowns, Goldwasser said he refused to "be cornered as to specifics," and when the drivers described the breakdowns they had experienced, the number did not seem abnormally large. Moreover, under the Company's truck rental arrangement, the lessor of the trucks bore the expense

of their repair. The Trial Examiner and the Board thus concluded that little credence should be attached to this ground for dismissal. Second, although the Company did change its trucking operation, this change did not go into effect until several months after the two drivers were discharged. In the interval, while deliveries were still being made out of Oneida, the Company used the services of a common carrier to make the deliveries which Robinson and Hughes had previously made and also employed one of its maintenance men for some deliveries. Third, the Company abandoned the reason it had set forth in its letter to the two men at the time they were discharged—that there had been a decline in the transportation of its own and others' products.

■ In view of the findings that the Company's asserted reasons for the discharge could not support this action, that the Company changed its purported reason for the dismissal, N. L. R. B. v. Milco, Inc., 388 F.2d 133 (2d Cir. 1968), that the discharges occurred so abruptly after the Company learned that these men were the staunchest supporters of the Union, N. L. R. B. v. United Mineral & Chemical Corp., 391 F.2d 829 (2d Cir. 1968), and that the discharges were the fulfillments of its earlier threats, we cannot see how the Board could have decided other than as it did.

### IV.

Finally, there remains for consideration the Company's alleged violation of § 8(a) (5). The Company here rests its defense primarily on the claim that after receipt of the Union's letter requesting bargaining on June 14 it had a good faith doubt as to the Union's majority because the Union falsely stated that all the drivers had become paid up members of the Union and subsequently that several drivers indicated that they were unsure as to whether they wished to continue supporting the Union. Additionally, the Company contends that it believed the appropriate unit should consist of all five drivers, while the Union contemplated a unit consisting of only the four over-the-road drivers.

■ The Union's statement that all of the drivers had become paid up members was indeed false. And we agree that such misrepresentation was entirely reprehensible. Nevertheless, on June 17, Goldwasser learned from Trexler that four of the drivers had signed cards which unambiguously authorized the Union to represent them. And while it is true that both Trexler and Baker expressed doubt over staying with the Union, neither gave this indication until after he had been threatened with reprisals for union activity. Moreover, after it had clearly learned of the Union's majority, the Company neither responded to the Union's request to bargain nor took any other action. For example, it never requested proof of the Union's majority, an act which would have indicated some evidence of its good faith doubt. Rather, it embarked on a course of action obviously designed to destroy the Union's majority. And when viewed against the background of such clearly illegal conduct, its claimed concern over the appropriateness of the bargaining unit suggested by the Union seems at best disingenuous. See Irving Air Chute Co. v. N. L. R. B., supra, 350 F.2d at 182.

■ Finally, the Company argues that it should not be ordered to bargain with the Union without first holding an election, relying on Crawford Mfg. Co. v. N. L. R. B., 386 F.2d 367 (4th Cir. 1967), cert. denied, 390 U.S. 1028, 88 S.Ct. 1408, 20 L.Ed.2d 286 (1968), and N. L. R. B. v. S. S. Logan Packing Co., 386 F.2d 562 (4th Cir. 1967). But those cases are manifestly inapposite here since in *Crawford,* the court found that the authorization cards had been obtained from the employees by a misrepresentation as to their significance and use and in *Logan* the court found only minimal violations of § 8(a) (1). In this case, in view of the Company's consistent and deliberate course of conduct in violation of §§ 8(a) (1), (3) and (5) we believe a bargaining order to be entirely appropriate. See,

e. g., N. L. R. B. v. Big Ben Department Stores, Inc., 396 F.2d 78 (2d Cir. 1968); N. L. R. B. v. Gotham Shoe Mfg. Co., 359 F.2d 684 (2d Cir. 1966).

The Company's petition for review is denied and the Board's cross-petition for enforcement is granted.