729 F.2d 172
 115 L.R.R.M. (BNA) 3161, 100 Lab.Cas. P 10,847
 LOCAL ONE, AMALGAMATED LITHOGRAPHERS OF AMERICA, affiliated
with International Typographical Union, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Howard Press, Inc., Intervenor.
 No. 58, Docket 83-4049.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 5, 1983.
Decided Feb. 24, 1984.
 
 Andrew Irving, New York City (Robinson, Silverman, Pearce, Aronsohn & Berman, New York City, of counsel), for petitioner.
 Miriam Szapiro, Atty., N.L.R.B., Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Helen Morgan, Atty., N.L.R.B., Washington, D.C., of counsel), for respondent.
 Edward R. Schwartz, Livingston, N.J., for intervenor.
 Before CARDAMONE, PIERCE and PRATT, Circuit Judges.
 GEORGE C. PRATT, Circuit Judge:
 
 
 1
 Petitioner Local One, Amalgamated Lithographers of America, pursuant to Sec. 10(f) of the National Labor Relations Act, 29 U.S.C. 160(f) (1976), seeks to review an order of the National Labor Relations Board that dismissed an unfair labor practice complaint against employer-intervenor Howard Press, Inc., a commercial printing business that employs approximately 125 workers. Local One's complaints to the board, later consolidated, alleged various unfair labor practices under Secs. 8(a)(1) and (a)(3) of the NLRA, 29 U.S.C. Sec. 158(a)(1) and (3), in connection with an election for union representation held on November 2, 1979, which the union lost by a vote of 15 to 6.
 
 
 2
 In the consolidated complaint the union presented two significant issues. It claimed first that by warnings of economic reprisals and other activities directed at its employees as a group, Howard Press had interfered with, restrained, and coerced its employees in the exercise of their rights guaranteed in Sec. 7 of the NLRA, 29 U.S.C. Sec. 157. On this issue the ALJ's findings and recommendation in favor of the union were accepted by the board, which implemented the recommendation with an order that requires Howard Press to cease and desist from threatening employees, from creating the impression that employees' union activities are under surveillance, or from otherwise interfering with, restraining, or coercing employees in the exercise of their rights under Sec. 7. Neither side has sought review of that part of the order.
 
 
 3
 The union's second claim raised the issue that is now before us. The union claimed that Howard Press had discharged Michael Doklia, Judith Blechar, and Leann Moss, who had been members of the union's organizing committee, because they were engaging in a protected activity, union organizing. Howard Press contended that it discharged the employees not because of their union activity, but because they had used marijuana on company premises and had been arrested as a result.
 
 
 4
 After hearing evidence on the union's charges of unfair labor practices, and after making certain findings of fact, the ALJ concluded that Howard Press, by discharging Doklia, Blechar, and Moss, had "discouraged membership in a labor organization by discriminating in regard to tenure of employment, thereby engaging in unfair labor practices in violation of Sec. 8(a)(3) and (1) of the Act." He based this conclusion on the facts that Howard Press knew of the three employees' union activity at the time of their suspensions and that Howard Press had exhibited "animus toward the union". As to the reason proferred by Howard Press for the discharges, the ALJ found that the past practice of Howard Press revealed that employees had been discharged for drug use only when it affected their faculties or work performance. He particularly noted the company's failure to suspend or terminate two other employees, discussed below, when it became aware that they had been smoking marijuana during a break. As to the three subject employees the ALJ found that there was no evidence they "were under the influence of drugs or that their work was affected at any time while such employees were at work", and he concluded that the discharges were because of anti-union animus.
 
 
 5
 Based on his finding that the unfair labor practices were pervasive, the ALJ recommended that, despite the union's loss of the representation election, the board should issue a bargaining order under the Supreme Court's decision in NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).
 
 
 6
 On administrative appeal, the board disagreed, finding that Howard Press had "discharged Doklia, Blechar, and Moss because of the information conveyed to [Howard Press] that those employees had used marijuana on company premises and were arrested at said premises for that reason." The board therefore overruled the union's objections based on retaliatory discharges, certified the election's result, and refused to issue a bargaining order. The union seeks review.
 
 DISCUSSION
 
 7
 The central issue is whether Howard Press violated Secs. 8(a)(1) and 8(a)(3) of the NLRA, 29 U.S.C. Secs. 158(a)(1) and (a)(3), when it discharged Doklia, Blechar, and Moss. More specifically, the question is whether the employees were discharged for their union activity or for their use of drugs on company premises.
 
 
 8
 The governing substantive rules were summarized by Justice White in an NLRB v. Transportation Management Corp., --- U.S. ----, 103 S.Ct. 2469, 2472, 76 L.Ed.2d 667 (1983):
 
 
 9
 Employees of an employer covered by the NLRA have the right to form, join, or assist labor organizations. NLRA Sec. 7, 29 U.S.C. Sec. 157. It is an unfair labor practice to interfere with, restrain, or coerce the exercise of those rights, NLRA Sec. 8(a)(1), 29 U.S.C. Sec. 158(a)(1), or by discrimination in hire or tenure 'to encourage or discourage membership in any labor organization,' NLRA Sec. 8(a)(3), 29 U.S.C. Sec. 158(a)(3).
 
 
 10
 Under these provisions it is undisputed that if the employer fires an employee for having engaged in union activities and has no other basis for the discharge, or if the reasons that he proffers are pretextual, the employer commits an unfair labor practice. He does not violate the NLRA, however, if any anti-union animus that he might have entertained did not contribute at all to an otherwise lawful discharge for good cause."
 
 
 11
 Because the ambiguities in situations involving dual or mixed motives for an employer's conduct repeatedly caused the board difficulty, it eventually adopted, in Wright Line, 251 N.L.R.B. 1083 (1980), enforced, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), what has become known as the Wright Line test, approved by the Supreme Court in NLRB v. Transportation Management Corp., supra. Under that test, in proceedings before the ALJ and the board, the burden initially is on general counsel to prove by a preponderance of the evidence that the employee's conduct protected by Sec. 7 of the act "was a substantial or a motivating factor in the discharge." Even if it is established, however, that "a desire to frustrate union activity" is a motivating factor in the discharge, the employer can still avoid being held by the board to be in violation of the act by proving by a preponderance of the evidence "that the discharge would have occurred in any event and for valid reasons * * *." 103 S.Ct. at 2473.
 
 
 12
 In this case the board did not specifically articulate a Wright Line analysis. It made no mention of Howard Press's anti-union animus as found by the ALJ, but instead simply found that Doklia, Blechar, and Moss were discharged "because of the information conveyed to [Howard Press] that those employees had used marijuana on company premises, and were arrested at said premises for that reason." The board's decision, therefore, could be interpreted as treating this as a pretext case, i.e., one where "the issue is whether either illegal or legal motives, but not both, were the 'true' motives behind the decision." NLRB v. Transportation Management, 103 S.Ct. at 2473 n. 5. Under that interpretation the board has found that the discharge was because of drug use, not union activity.
 
 
 13
 Alternatively, the administrative proceedings as a whole could be viewed as a dual motive case, calling for application of the Wright Line test. In that perspective the ALJ's finding of anti-union animus would constitute the first determination, and the board's finding of a valid reason for the discharges would constitute an acceptance of the employer's "affirmative defense" under the Wright Line analysis. See 103 S.Ct. at 2473. The particular mode of analysis is unimportant in this case, however, because whichever approach is taken, pretext or dual motive, the result before the board would be the same as long as Howard Press proved by a preponderance of the evidence that the discharge was because of drug use. Of course, on reviewing the board's decision, this court need not find that Howard Press proved its case by a preponderance; rather, the standard for review of the agency's decision limits our inquiry to one issue--whether there is substantial evidence to support the board's finding that the discharge was because of drug usage. 29 U.S.C. Sec. 160(e).
 
 
 14
 Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). It is "more than a mere scintilla." Id.; see also Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). Substantial evidence on the record as a whole includes that evidence opposed to the board's view. Universal Camera Corp. v. NLRB, 340 U.S. 474, 485-488, 71 S.Ct. 456, 463-64, 95 L.Ed. 456 (1951). Further, even if this court could draw different conclusions from those drawn by the agency, that would not prevent the agency's decision from being supported by substantial evidence. City of Oakland v. Donovan, 703 F.2d 1104, 1106 (9th Cir.), modified, 707 F.2d 1013 (1983).
 
 
 15
 The union makes much of the fact that initially the ALJ ruled in its favor. While the ALJ's decision is part of the record and his findings on credibility are entitled to some deference, our task is to determine whether the board's decision, not the ALJ's, is supported by substantial evidence. Universal Camera Corp. v. NLRB, 340 U.S. at 492-96, 71 S.Ct. at 466-68; see also NLRB v. Donald E. Hernly, Inc., 613 F.2d 457, 461-62 (2d Cir.1980); Kopack v. NLRB, 668 F.2d 946, 956 (7th Cir.), cert. denied, 456 U.S. 994, 102 S.Ct. 2278, 73 L.Ed.2d 1290 (1982); NLRB v. W.R. Grace & Co., 571 F.2d 279, 282 (5th Cir.1978); see generally 3 K. Davis, Administrative Law Treatise Sec. 17.16 (2d ed. 1980).
 
 
 16
 Applying these principles, we are satisfied that the board's decision in favor of Howard Press on the retaliatory discharge claim is supported by substantial evidence. As the ALJ found, Howard Press had a long-standing policy against using drugs or alcohol at work. A number of employees testified that they understood from the time they were hired that if they violated this policy they would be fired. Warvel, Moss, and DeLuca all admitted they knew of the policy.
 
 
 17
 Over the years, the company had discharged employees it knew used drugs or alcohol at work. In February 1979, B.K. was dismissed after he had been using drugs at work. During the spring of 1979, the company also threatened to discharge three other employees, M.L., J.R., and O.R., who were suspected of using drugs on the company property, but all three denied the charge. J.R. and O.R. were given warnings and were told if they were ever suspected of using drugs on their break they would be fired. M.L. was subsequently forced to resign when he was denied an expected wage increase.
 
 
 18
 Throughout early 1979, company officials had received reports that employees at the plant were using drugs, predominantly marijuana. Drug related graffiti appeared daily on the restroom walls. In the spring of 1979, when Herbert Porter, president of Howard Press, came to realize there was a widespread and growing drug problem in the plant, he contacted the police department, as he had in the past when he had other problems such as vandalism, traffic, and parking. Porter told the chief that because there was dangerous equipment in the plant, he was concerned that someone could be injured or killed if they were to operate it while high. At the request of the officer assigned to the problem by the chief, Porter prepared a list of names and addresses of all the company's employees. On reviewing the list the officer commented that a few of the names were familiar to him and that he had previously arrested Doklia on a drug charge.
 
 
 19
 Later, the police put Doklia's van, parked in the plant's parking lot, under surveillance. Photographs of various employees smoking marijuana inside the van led to the arrest on June 1 of Doklia, Blechar, Moss, and Sharon DeLuca, Mark Perlach, and James Warvel. All six were suspended the following day. Ultimately, Warvel and Perlach were reinstated, DeLuca resigned, and Doklia, Blechar, and Moss were discharged.
 
 
 20
 Substantial evidence supports the board's conclusion that the differing treatments of the six arrested employees did not show that the employer acted with unlawful motivation. There were strong indications that Warvel and Perlach, who were not discharged, were not guilty of using drugs on company premises, while Moss, Doklia, and Blechar, who were discharged, were guilty of doing so. Moreover, both Warvel and Perlach had returned immediately to the plant to profess their innocence, and Moss and DeLuca corroborated their claims. In contrast, Doklia and Blechar never claimed to the employer that they were innocent; they merely sent identical letters a week later asking why they were suspended and when they could come back to work.
 
 
 21
 Porter later obtained a police report which noted that certain evidence, including marijuana cigarettes, had been taken from Moss, and that marijuana and drug paraphernalia had been confiscated from Doklia's van and his residence. In addition, Moss admitted that she, Doklia, Blechar, and DeLuca had smoked pot regularly in Doklia's van. A few days later DeLuca pled guilty to the marijuana charge and resigned her job.
 
 
 22
 We recognize that the evidence is susceptible of conflicting inferences, but where different inferences from the evidence are possible, an administrative agency may draw an inference inconsistent with that drawn by the ALJ, and we will not reverse as long as its inference is supported by substantial evidence. Adolf Coors Co. v. FTC, 497 F.2d 1178, 1184 (10th Cir.1974), cert. denied, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975).
 
 
 23
 Although the board's final result was contrary to that reached by the ALJ, the board's findings and conclusions regarding drug use by Howard Press employees differ from the ALJ's in only two material respects. First, the ALJ concluded that the past practice of Howard Press was to discharge employees only when drug use "affected their work performance * * *." The board disagreed, referring to discharges of other individuals in the spring of 1979 and pointing out the absence of any prior incident comparable to the arrests of Doklia, Blechar and Moss. There is substantial evidence to support the board's view, most notably the testimony of Porter.
 
 
 24
 The other material difference between the board and the ALJ involves the incident regarding employees J.R. and O.R. The board disagreed with the ALJ's conclusion that Howard Press had permitted these two to continue working after it was aware they had smoked marijuana on the company premises. Again, the evidence presented on this incident is susceptible to different inferences. However, the facts that neither J.R. nor O.R. was actually caught smoking on company premises and that both denied doing so, sufficiently differentiates them from Doklia, Blechar, and Moss. Moreover, neither J.R. nor O.R. was arrested for drug use on company premises.
 
 
 25
 In short, substantial evidence supports the board's determination that Howard Press fired Doklia, Blechar, and Moss not to discourage union activity but for smoking marijuana on company property. The petition for review is therefore denied.
 
 PIERCE, Circuit Judge, dissenting:
 
 26
 * I respectfully dissent.
 
 
 27
 In my view, the ALJ was correct in finding that the discharges of Doklia, Blechar and Moss were unfair labor practices. The findings of the National Labor Relations Board ("Board" or "NLRB") are not supported by substantial evidence on the record as a whole. True, it is our role, as a reviewing court, to respect "the expertise of the Board when its conclusions are rationally based on articulated facts," NLRB v. Yeshiva University, 444 U.S. 672, 691, 100 S.Ct. 856, 867, 63 L.Ed.2d 115 (1980). However, after reviewing the record, the ALJ's decision and the Board's decision herein, it is clear to me that the deference normally accorded the Board is unwarranted in this case.
 
 II
 
 28
 Section 8(a)(3) of the National Labor Relations Act ("NLRA" or "Act") states in pertinent part that "[i]t shall be an unfair labor practice for an employer--... (3) by discrimination in regard to hire or tenure of employment ... to encourage or discourage membership in any labor organization ...." 29 U.S.C. Sec. 158(a)(3) (1976). This section was enacted as one of several provisions in the Act designed "to protect employee self-organization and the process of collective bargaining from disruptive interferences by employers." American Ship Building Co. v. NLRB, 380 U.S. 300, 317, 85 S.Ct. 955, 966, 13 L.Ed.2d 855 (1965); see also NLRB v. Milk Drivers & Dairy Employees, Local 338, 531 F.2d 1162, 1163 (2d Cir.1976).
 
 
 29
 As the words of the statute indicate, discriminatory conduct by an employer in regard to hire or tenure to discourage union membership is prohibited. Proof of a violation of the statute requires evidence of discrimination, unlawful intent, and a resulting discouragement of union membership. NLRB v. Brown, 380 U.S. 278, 286, 85 S.Ct. 980, 985, 13 L.Ed.2d 839 (1965); see also NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 32-33, 87 S.Ct. 1792, 1796-97, 18 L.Ed.2d 1027 (1967); American Ship Building Co., 380 U.S. at 311, 85 S.Ct. at 963; cf. Waterbury Community Antenna, Inc. v. NLRB, 587 F.2d 90, 96 (2d Cir.1978).
 
 
 30
 An employer is free to discharge an employee so long as the discharge is not due to the employee's union activity. NLRB v. Great Eastern Color Lithographic Corp., 309 F.2d 352, 355 (2d Cir.1962), cert. denied, 373 U.S. 950, 83 S.Ct. 1680, 10 L.Ed.2d 705 (1963). The "true purpose," Radio Officers' Union v. NLRB, 347 U.S. 17, 43, 74 S.Ct. 323, 337, 98 L.Ed. 455 (1954), "real motive," id., or "actual reason," Associated Press v. NLRB, 301 U.S. 103, 132, 57 S.Ct. 650, 655, 81 L.Ed. 953 (1937), for the discharge must not be based in whole or in part on anti-union animus. NLRB v. Transportation Management Corp., --- U.S. ----, 103 S.Ct. 2469, 2474, 76 L.Ed.2d 667 (1983). An employer does not violate the NLRA "if any anti-union animus that he might have entertained did not contribute at all to an otherwise lawful discharge for good cause." Id. at 2472. The Board's decisions "have consistently held that the unfair labor practice consists of a discharge ... that is based in whole or in part on anti-union animus ...." Id. at 2474 (emphasis added).
 
 III
 
 31
 Our standard of review is governed by section 10(e) of the Act which provides that "[t]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. Sec. 160(e) (1976); see also NLRB v. Erie Resistor Corp., 373 U.S. 221, 236, 83 S.Ct. 1139, 1149, 10 L.Ed.2d 308 (1963). It is the reviewing court's "duty to set aside [the Board's] decision if [the court] 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes ....' " Bon-R Reproductions, Inc. v. NLRB, 309 F.2d 898, 903 (2d Cir.1962) (quoting in part Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)). The limited judicial review allowed by the substantial evidence rule does not reduce the role of the reviewing court to that of a rubber stamp.[1]
 
 
 32
 Thus, an appropriate review of the Board's decision herein under the substantial evidence standard requires us to look at the evidence of the facts and circumstances that the Board interpreted as showing a lack of anti-union animus and then requires us to ask whether this evidence furnishes satisfactory support for the Board's conclusion. NLRB v. Milco, Inc., 388 F.2d 133, 138 (2d Cir.1968); see also NLRB v. West Coast Casket Co., 469 F.2d 871, 874 (9th Cir.1972) (consideration of the total setting in which the discharge occurred required in section 8(a)(3) cases).
 
 
 33
 Another important aspect of our review involves the contrary results reached by the Board after rejecting certain key findings made by the ALJ. Normally, when the Board reaches conclusions contrary to the ALJ, this conflict does not modify the substantial evidence standard of review.[2] Universal Camera Corp., 340 U.S. at 493-96, 71 S.Ct. at 467-68; NLRB v. Donald E. Hernly, Inc., 613 F.2d 457, 462 (2d Cir.1980). However, "the findings of the ALJ are a part of the record that must be considered by the reviewing court in assessing the substantiality of the support for the Board's findings. This is especially true where the findings hinge principally on questions of the credibility of the witnesses." Id.; see also NLRB v. Interboro Contractors, Inc., 388 F.2d 495, 499 (2d Cir.1967); Bon-R Reproductions, Inc., 309 F.2d at 907 (ALJ's determination of intent by demeanor evidence should be given "special weight"). The Board's evidence, in cases where it does not accept the ALJ's findings, "must be stronger than ... in cases where the findings are accepted." Interboro Contractors, Inc., 388 F.2d at 499; see also Universal Camera Corp., 340 U.S. at 496, 71 S.Ct. at 468; NLRB v. Coletti Color Prints, Inc., 387 F.2d 298, 303 (2d Cir.1967) (the decision of the ALJ is a detracting factor in the Board's decision when evaluated under the substantial evidence test); cf. Colson Equipment, Inc. v. NLRB, 673 F.2d 221, 223 (8th Cir.1982) ("[w]here the Board's findings of fact are contrary to the ALJ's factual conclusions this court will review more critically the Board's findings"); NLRB v. Ridgeway Trucking Co., 622 F.2d 1222, 1224 (5th Cir.1980) ("when the Board does not accept the findings of an ALJ, the evidence and the findings of the Board must be examined more critically than if the two had been in agreement"); NLRB v. Big Bear Supermarkets # 3, 640 F.2d 924, 928 (9th Cir.) ("[b]ecause the ultimate findings of the Board are contrary to those of the ALJ, we must pay particular attention to the standard of review of the Board's findings of fact"), cert. denied, 449 U.S. 919, 101 S.Ct. 318, 66 L.Ed.2d 147 (1980); Butler-Johnson Corp. v. NLRB, 608 F.2d 1303, 1305 (9th Cir.1979) ("when findings of motive or purpose depend entirely upon credibility, the decision of the ALJ will be given special weight").
 
 
 34
 Herein, it is not only necessary to consider the ALJ's decision as part of the record as a whole because the Board's decision contradicts the ALJ's decision in part, but it is also necessary to evaluate closely the ALJ's decision because the Board stated that it expressly affirmed the rulings, findings, and conclusions of the ALJ "to the extent consistent" with its own decision.
 
 IV
 A. The ALJ's Opinion
 
 35
 The proceeding between Howard Press, Inc. ("Howard Press") and Local One Amalgamated Lithographers of America, affiliated with International Typographical Union, AFL-CIO (the "Union") presented the following issues to the ALJ: (1) whether Howard Press had violated sections 8(a)(1) and (3) of the NLRA by discharging employee Peter Schulz on May 19, 1979; (2) whether Howard Press violated sections 8(a)(1) and (3) of the NLRA by discharging employee Leann Moss on July 2, 1979; (3) whether Howard Press violated sections 8(a)(1), (3), and (4) of the NLRA by discharging employees Michael Doklia and Judith Blechar on July 2, 1979; (4) whether Howard Press violated section 8(a)(1) of the NLRA by warnings of reprisals, by creation of an impression of surveillance of employee union activities, and by solicitation of grievances; and (5) whether Howard Press violated sections 8(a)(1) and (5) of the NLRA by refusing to bargain with the Union.
 
 
 36
 On March 26, 1981, the ALJ made his findings and concluded, inter alia: (1) that several speeches given by Herbert Porter, president of Howard Press, and Norman Birney, executive assistant to Porter, to Howard Press employees in May, 1979, were violative of section 8(a)(1) of the NLRA; (2) that Porter and Birney created the impression that Howard Press was keeping its employees' activities in support of the Union under surveillance; (3) that Howard Press did not solicit grievances from its employees in violation of the NLRA; (4) that Howard Press violated section 8(a)(1) of the NLRA by implying a promise of benefits to Howard Press employees after the union problem was resolved; (5) that Howard Press did not violate sections 8(a)(1) and (3) of the NLRA by discharging Peter Schulz for nondiscriminatory quality of work reasons; (6) that Howard Press discriminatorily discharged Doklia, Blechar and Moss because of their union activities in violation of sections 8(a)(1) and (3) of the NLRA; and (7) that Howard Press, by refusing to bargain with the Union, engaged in conduct violative of sections 8(a)(1) and (5) of the NLRA.
 
 B. The Board's Decision
 
 37
 On December 16, 1982, the Board issued its decision. After noting that the issues before it focused on the alleged violations of sections 8(a)(1) and (3) by Howard Press' discharges of Doklia, Moss, and Blechar, the Board determined that Howard Press did not treat "Doklia, Blechar, and Moss ... in a disparate manner vis-a-vis other employees who might be arrested ... charged, and apparently convicted of such drug usage;"[3] that Howard Press' discharges of Doklia, Blechar, and Moss did not violate sections 8(a)(1) and (3) of the NLRA; and that the section 8(a)(5) violation must be dismissed.
 
 C. Discussion
 
 38
 The Union contends that Doklia, Blechar and Moss were discharged for their union activities and that a Gissel bargaining order should issue.[4] The Union, in support of its contentions, asserts that Howard Press acted discriminatorily by discharging three known union advocates for allegedly using marijuana when the evidence demonstrated that other identifiable company employees who were not known for their union activity, but who had been discovered using marijuana on company premises, were not discharged. The Board contends that it was compelled to find on the record that Howard Press did not violate sections 8(a)(1) and (3) of the NLRA by discharging employees Doklia, Blechar, and Moss after they used marijuana on company premises and were arrested therefor. Howard Press, as intervenor, contends that substantial evidence supports the Board's finding and conclusion that the discharges of Doklia, Blechar and Moss were for use and possession of drugs while on company property in violation of a known company rule. Additionally, it urges that substantial evidence supports the Board's finding and conclusion that the employer had not committed such pervasive unfair labor practices as to require a Gissel bargaining order, and that substantial evidence on the record supports the Board's decision that the Union's objections to the subsequent election were without merit. I believe that the Board and Howard Press are incorrect.
 
 1. Substantial Evidence
 
 39
 In my view the Board's decision is not supported by substantial evidence on the record as a whole. Specific analytic guideposts are available for making a determination as to an employer's motive for discharge. For example, the work records and quality of work of discharged employees are often evaluated in section 8(a)(3) cases. See, e.g., Berbiglia, Inc. v. NLRB, 602 F.2d 839, 845 (8th Cir.1979); NLRB v. Mid State Sportswear, Inc., 412 F.2d 537, 539 (5th Cir.1969). Herein, the ALJ explicitly found that Doklia, Blechar and Moss had received no complaints regarding their work, work history or quality of work. In fact, Porter and Birney acknowledged in speeches to employees that Doklia and Blechar were good workers, when stating that each "progressed nicely in the last 12-14 months with promotions, salary increases, and the like." The Board adopted and affirmed these findings by the ALJ.
 
 
 40
 Another analytical guidepost is the timing of a discharge, since this might support the conclusion that an employer's reason for discharge was motivated by anti-union animus. Waterbury Community Antenna, Inc., 587 F.2d at 101; NLRB v. Montgomery Ward & Co., 554 F.2d 996, 1002 (10th Cir.1977). Herein, the close proximity of the discharges to union-related activities and to other company activities is highly significant. Shortly before May 7, 1979, Howard Press became aware that its employees were discussing the Union. On or about May 7, 1979, a majority of the lithographic production employees designated the Union as their representative for purposes of collective bargaining with Howard Press. On that same date, according to the findings of the ALJ, President Porter and Executive Assistant to the President Birney orally delivered from written notes a total of three separate, section 8(a)(1)-violative speeches to company employees. As I will discuss later, the ALJ found that the speeches contained direct threats to Doklia and Blechar. By letter dated May 9, 1979, the Union notified Howard Press that it had filed a petition for an election among lithographic production employees. This letter included an offer to negotiate a collective bargaining agreement. Also by letter on that date, the Union notified Howard Press that Doklia, Blechar and Moss were members of the Union organizing group's inner working committee.[5] On May 14, 1979, Howard Press refused to bargain with the Union when informed that a majority of lithographic production employees had authorized the Union to bargain for them. Also on May 14, the Union filed a representation petition. On May 22, 1979, the NLRB notified Howard Press that it was required to attend a representation hearing involving the Union scheduled for May 30, 1979. In late May, Howard Press contacted Linden police officials about a "drug" problem. On May 30, 1979, the representation hearing began.[6] Two days later, June 1, Linden police arrested Doklia, Blechar, Moss and others. One day later, June 2, Howard Press suspended Doklia, Blechar and Moss without pay. On July 2, 1979, Howard Press terminated the employment of Doklia, Blechar and Moss.
 
 
 41
 The aforementioned events are highly probative of Howard Press' motive for the discharges of these employees. Within a period of less than a month after it became aware that its employees were discussing the Union, Howard Press stated in its three separate speeches, found by the ALJ to be violative of section 8(a)(1), that it had "adequate cause" to fire Doklia and Blechar. It managed to fulfill the prophecies contained in the three speeches given to the employees concerning an "adequate cause" for the discharges. See Trey Packing, Inc. v. NLRB, 405 F.2d 334, 339 (2d Cir.1968) (fulfillment of earlier threat is factor supporting Board's finding of section 8(a)(3) violation), cert. denied, 394 U.S. 919, 89 S.Ct. 1191, 22 L.Ed.2d 452 (1969). Further, Howard Press initiated the "adequate cause" within days after the Union presented its bargaining request. Then, significantly, the "adequate cause" led to these employees' arrests two days after the representation hearing had begun. The timing of these events supports the inference drawn by the ALJ that Howard Press believed that union organizers Doklia, Blechar and Moss were smoking marijuana in Doklia's van during break time and, as the Union suggests, that Howard Press used the knowledge as part of a total course of conduct designed to erode the support for the Union by discharging Doklia, Blechar and Moss. The timing of these events also supports the reasonable conclusion asserted by the Union that Howard Press initiated its police contact not for the purpose of discouraging drug use, but for the purpose of eliminating the primary Union organizers and thus crushing the organizing attempts of the Union.
 
 
 42
 Another guidepost that is useful in determining an employer's motive in discharge cases is the employer's tolerance of similar employee conduct in the past. NLRB v. Charles Batchelder Co., 646 F.2d 33, 40 (2d Cir.1981). Evidence that employees other than those discharged were not considered dischargeable despite similar company rule violations is highly probative of employer motive. NLRB v. Jacob E. Decker & Sons, 636 F.2d 129, 131 (5th Cir.1981); NLRB v. Midtown Service Co., 425 F.2d 665, 670 (2d Cir.1970).
 
 
 43
 Herein, the Board and the ALJ agree that Howard Press had a rule prohibiting employee usage of drugs. However, in relation to the principal question--Howard Press' actual reason for discharging Doklia, Blechar and Moss--the existence of a company rule only begins the inquiry. See Great Eastern Color Lithographic Corp., 309 F.2d at 355. Critically important to ascertaining Howard Press' reason for discharging the subject employees is an examination of how Howard Press applied the company rule against drug usage to its other employees.
 
 
 44
 The ALJ, after examining Howard Press' record of discharges noted:
 
 
 45
 The sum of the evidence reveals that there ha[ve] been discharges of employees when the usage of alcohol or marijuana or other drugs had an obvious effect on the physical ability of employees to perform work. On the other hand, the evidence in this case reveals that [Howard Press] did not discharge employees upon mere belief of usage of alcohol or drugs or when the facts did not reveal an obvious impairment of the employees' faculties.
 
 
 46
 Further, the ALJ identified two employees, J.R. and O.R., whom Howard Press permitted to continue to work after the company became aware that they had smoked marijuana on company premises in March 1979--approximately four months before the subject discharges herein--and that such employees had shown the effects of having smoked marijuana. The ALJ observed that J.R. and O.R., after being questioned by a Howard Press supervisor, admitted that they had been smoking marijuana on company premises. Additionally, the ALJ found that a Howard Press memorandum was corroborative of J.R.'s and O.R.'s own version of the events. The Howard Press memo, signed by the executive assistant, Birney, stated:
 
 
 47
 [J.R. and O.R.] caught smoking pot on their lunch break. I confronted both in my office along with Gordon Eitel. They both admitted smoking pot. I warned them if they ever did it again they would both be fired .... & we would advise their parents as to why they were discharged.[7]
 
 
 48
 After considering contradictory testimony from the supervisor involved in the incident, the ALJ concluded that Howard Press knew that J.R. and O.R. had smoked marijuana on company premises. Nevertheless, Howard Press reprimanded the two rather than discharged them.
 
 
 49
 Although the ALJ stated his reasoning as it related to record evidence to explain his findings regarding J.R. and O.R., the Board, without stating any reason for its conclusion, declined to adopt the ALJ's interpretation of the incidents concerning these two employees. Further, the Board reversed the ALJ's finding that Howard Press' past practice revealed that employees were discharged only when drug usage affected their faculties or work performance. It found this conclusion not supported by the record.
 
 
 50
 The majority seems to recognize that the Board's findings on these crucial points lack reasoning and analysis and fail to refer to explicit evidence in the record that would justify its reversal of the ALJ. The majority has searched the record and identifies four discharge situations that it believes support the Board's reversal. The majority states that in February 1979, B.K. was dismissed after it was discovered that he had been using drugs at work. However, the record of this dismissal supports the view that B.K. was dismissed after it was obvious that his drug usage had affected his ability to perform his work. This is unlike the situation herein. The majority acknowledges that another employee, M.L., was not discharged by Howard Press for drug usage. M.L. resigned after he was denied an anticipated wage increase.[8] Third, the majority does not deny that previously-discussed employees J.R. and O.R., caught smoking marijuana on company premises, were not discharged for drug usage. In offering a distinction between the incident involving J.R. and O.R. and the incident involving Doklia, Blechar and Moss, the majority states that J.R. and O.R. denied the charge that they smoked marijuana on company premises. This statement is contradicted directly by the testimony at the hearing of J.R. and O.R., two witnesses found by the ALJ to be disinterested, and also by the Howard Press memorandum signed by the executive assistant, Birney, which states that J.R. and O.R. were "caught smoking pot on their lunch break" and "[t]hey both admitted smoking pot."[9]
 
 
 51
 In sum, the past practice of Howard Press regarding discharges for drug usage in violation of company rules reveals that of the four employees cited by the majority, only one, B.K., could be classified as a drug-related discharge. The second "discharge," involving M.L., is unrelated to drug usage. But, more importantly, the remaining two employees, J.R. and O.R., who were involved in an incident similar to and proximate to the instant situation were not discharged by Howard Press despite their undisputed admissions of drug usage on company property. This company inaction stands in sharp contrast to Howard Press' contention that it consistently and strictly enforced its long-standing policy against drug usage on company premises. The J.R. and O.R. inaction also stands in sharp contrast to Howard Press' treatment of Doklia, Blechar and Moss. Thus, record evidence of the past practice of Howard Press supports the ALJ's finding that the union activities of Doklia, Blechar and Moss were the actual causes, certainly in part if not in whole, of disparate treatment as between them and other employees in similar situations at Howard Press.[10]
 
 
 52
 In general, the occurrence of other unfair labor practices, in proximity to employee discharges, allows an inference to be drawn that an employer was motivated by anti-union animus. NLRB v. American Spring Bed Manufacturing Co., 670 F.2d 1236, 1245 (1st Cir.1982). Further, short of proven unfair labor practices, hostility toward union activities is highly significant in determining employer discharge motive. Berbiglia, Inc., 602 F.2d at 843-44; see also West Coast Casket Co., 469 F.2d at 874 (anti-union animus shown by president's statements concerning employees who were active in the union organizing campaign); Milco, Inc., 388 F.2d at 139 (labor law violation supported by the fact that the discharge was made while company was engaging in acts indicating hostility toward union); accord Great Eastern Color Lithographic Corp., 309 F.2d at 355.
 
 
 53
 Herein, there is evidence of the employer's hostile attitude toward union activities and there are proven, Board-affirmed, unfair labor practices. This hostile attitude toward union activities was demonstrated when the Company gave three speeches before employees on May 7, 1979. Also, the Board affirmed the ALJ's determination that Howard Press, through Porter and Birney, created the impression that it was keeping company employees' activities in support of the Union under surveillance. Further, the Board affirmed the ALJ's determination that President Porter's remarks before Howard Press employees constituted an implied promise of benefits after the union problem was resolved and that this conduct violated section 8(a)(1) of the NLRA.
 
 
 54
 The foregoing is not the end of Howard Press' demonstration of its hostile attitude toward the Union. In its several May 7, 1979, remarks about the Union, Howard Press did not limit itself to generalized remarks, but specifically mentioned two employees that it suspected of union activity:
 
 
 55
 While many unions make much of FEAR in their organizing drives--they had nothing to fear here. As example--since the last organizing drive until now we had adequate cause to fire Mike Doklia if we'd chosen to--and it wouldn't have been construed as an unfair labor practice--or Judy [Blechar] (too) who presumably feels the same as Mike (active in last year's drive). YET, each of them has progressed nicely in the last 12-14 months with promotions, salary increases, and the like--and have been treated as cordially, considerately, and [sic] as much dignity as all the other employees.
 
 
 56
 Thus, the employer singled out for particular comment Doklia and Blechar--two employees it believed were the instigating forces behind the Union activity and both of whom were soon thereafter discharged.
 
 
 57
 The sum of the discharged employees' work records, the quality of work of these employees, the timing of their discharges, the section 8(a)(1)-violative speeches, Howard Press' tolerance of similar behavior in the past, Howard Press' actions in creating the impression that it was keeping company employees' activities in support of the Union under surveillance, and, within two months of their discharges, the specific references to Doklia and Blechar as having been active in union organizing activities constitutes more than ample evidence supporting the conclusion that the discharges of Doklia, Blechar and Moss were motivated by anti-union animus and that the actual reason for the discharges, in whole or in part, was due to their union-related activities.
 
 
 58
 The testimony that Howard Press' president, Herbert Porter, gave at the hearing before the ALJ concerning the company's inclination to discharge the subject employees after their arrests sheds some additional light on Howard Press' anti-union animus:
 
 
 59
 Q. Will you explain to the Court, please?
 
 
 60
 A. I was inclined to discharge Blechar and Doklia and Moss around the same time we reinstated [also arrested employees] Perlach and Warvel, based on the information that I had.
 
 
 61
 Because these people were involved in a union organizing drive. After speaking with you, you counseled that I simply leave them on suspension temporarily, because a trial might be coming up that would find them guilty or whatever.
 
 
 62
 And I accepted your advice to leave them on suspension.[11]
 
 
 63
 (Emphasis added).
 
 
 64
 In sum, I believe that the evidence does not support the Board's finding of no section 8(a)(1) and (3) violations regarding the discharges of Doklia, Blechar, and Moss. In fact, the ALJ's findings, many of which were affirmed by the Board, support the view that there is substantial evidence for the conclusion that the actual reasons for the discharges of Doklia, Blechar and Moss were based on anti-union animus. This evidence of unlawful intent herein, when coupled with the evidence of disparate treatment and the reasonable inference of a resulting discouragement of union membership,[12] is more than a sufficient basis in my view to conclude that substantial evidence exists in this case that the discharges of Doklia, Blechar and Moss violated sections 8(a)(1) and (3) of the NLRA.
 
 2. Administrative Considerations
 
 65
 Brief comment concerning the administrative inadequacy of the Board's decision seems warranted. First, as the majority appears to recognize, the Board's decision contains no legal analysis in support of its reversal of the key ALJ findings. Indeed, one cannot help but note the tentative tone of the majority opinion, characterized by such language as, "The board's decision, therefore, could be interpreted as ...." (Emphasis added).
 
 
 66
 Second, in addition to lacking legal analysis, the Board's opinion lacks an explicit statement of evidence and of findings of fact that support its conclusions that differ from the ALJ's findings and conclusions. The Board's conclusions should be adequate, rational and non-arbitrary. Erie Resistor, 373 U.S. at 236, 83 S.Ct. at 1149. In addition, the Board's conclusions should be rationally based on articulated facts. Yeshiva University, 444 U.S. at 691, 100 S.Ct. at 867. Herein, the Board has failed to refer to facts that could be evaluated by this court on review. This omission is especially apparent in the past practice portion of the Board's opinion.[13] That portion of the Board's opinion strikes at the heart of the disparate treatment finding by the ALJ, yet the Board did not document any evidence in the record that it viewed as supporting its rejection of the ALJ's findings and conclusions. This crucial omission, which forces the majority herein to speculate about the evidence that the Board relied upon to support its reversal, flies in the face of the rule that the Board's evidence, in cases where it does not accept the ALJ's findings, must be stronger than in cases where the findings are accepted. Interboro Contractors, Inc., 388 F.2d at 499. I believe this practice by the Board is unacceptable and should not be countenanced.
 
 
 67
 Finally, I note that the Board affirmed many findings by the ALJ which flowed contrary to its ultimate determination that sections 8(a)(1) and (3) were not violated. In light of the abundance of evidence discussed herein, the Board's affirmance of the ALJ's findings and conclusions "to the extent consistent herewith" is merely pro forma language, and I conclude that, in these circumstances, this scant language is insufficient to convince one that the Board considered all the evidence on the record as a whole. Such an omission, in the circumstances here, makes the Board's decision deficient as a matter of law. 29 U.S.C. Sec. 160(e) (1976).
 
 V
 
 68
 In short, in my view, substantial evidence supports the view that the "substantial or motivating," Transportation Management Corp., 103 S.Ct. at 2474, reason for discharging Doklia, Blechar and Moss was to discourage union activity. Therefore, I would grant the Union's petition for reversal of the Board's decision and remand for reinstatement of the ALJ's finding that Howard Press violated sections 8(a)(1) and (3) of the NLRA. Further, also I would reverse the Board's finding that a Gissel bargaining order was not warranted.
 
 
 
 [1]
 The Supreme Court stated more than three decades ago:
 Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.
 Universal Camera Corp., 340 U.S. at 490, 71 S.Ct. at 466.
 
 
 [2]
 On this point, the Supreme Court has stated:
 We do not require that the [ALJ's] findings be given more weight than in reason and in the light of judicial experience they deserve. The "substantial evidence" standard is not modified in any way when the Board and [the ALJ] disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced [ALJ] who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the [ALJ] are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case. To give it this significance does not seem to us materially more difficult than to heed other factors which in sum determine whether evidence is "substantial."
 Id. at 496-97, 71 S.Ct. at 469.
 
 
 [3]
 I am in accord with the view that, standing alone, an employer need not tolerate drug usage on its premises during working hours and suffer the possible, if not likely, interference with work performance
 
 
 [4]
 NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). The ALJ concluded that a Gissel bargaining order was warranted
 
 
 [5]
 The text of the letter stated:
 Enclosed is a partial list of the inner working committee, employed at your plant, whose assistance I have obtained to seek a National Labor Relations Board Election.
 A duplicate copy has been sent, [registered] mail, to the National Labor Relations Board for their protection.
 Committee .... Michael P. Doklia
 Peter M. Schulz
 Judith Blechar
 Leann Moss
 Peter A. Veltre, Jr.
 
 
 [6]
 On May 30, 1979, the first day of the representation hearing, President Porter, while testifying, noted specifically that Blechar and Doklia were present at the proceeding
 
 
 [7]
 The ALJ noted that the Howard Press memorandum of March 22, 1979, had been the subject of two alterations made at a later date. The memorandum originally read: "[J.R. and O.R.] caught smoking pot on their lunch break." One alteration in the memorandum involved two horizontal lines placed through "caught" and the word "suspected " placed to the side of the interlineated "caught." Further, the memorandum originally read: "they both admitted smoking pot." The second alteration in the memorandum had a curved line extending to the margin connecting the words "But not today."
 
 
 [8]
 M.L. was not, as the majority phrases it, "forced to resign." Herbert Porter, president of Howard Press, admitted, when asked whether M.L. quit, that, "The record will probably reflect that."
 
 
 [9]
 The only denial that the majority could be referring to is a denial by J.R. and O.R. when they were confronted initially by the supervisor. This denial was later abandoned by both employees. The admission of drug usage was recorded by Birney in the March 22, 1979, memorandum. Further, this admission was confirmed by J.R. and O.R. at the hearing before the ALJ
 
 
 [10]
 This finding is buttressed further when it is noted that the Board adopted and affirmed the ALJ's finding that the evidence revealed that at least some of Howard Press' employees smoked marijuana and that some drug-related writing appeared on bathroom walls in early 1979. Despite the company's proffered concern and despite these events, there is no evidence in the record to show that in early 1979 the company gave speeches and posted notices referring to any rule or policy concerning drug usage
 
 
 [11]
 I would not consider this statement, standing alone, to demonstrate anti-union animus
 
 
 [12]
 Whether Howard Press' actions accounted for the eventual turn of events cannot be proven to an absolute certainty. However, the evidence shows that by letter of May 9, 1979, the Union notified Howard Press that a majority of the lithographic production employees had authorized the Union to bargain for them. After Howard Press discharged Doklia, Blechar and Moss on July 2, 1979, the Union lost the subsequent representation election held on November 2, 1979. This evidence supports the ALJ's conclusion that the discharges of Doklia, Blechar and Moss had an effect on the November 2 election
 
 
 [13]
 The entire past practice portion of the Board's opinion reads:
 The Administrative Law Judge's conclusion that [the company's] past practice revealed that employees were discharged only when drug usage affected their faculties or work performance is similarly unpersuasive, and in our view is not supported on this record. Thus, the Administrative Law Judge's discussion does not appear to take into account discharges of other individuals in the spring of 1979 prior to [the company] contacting the police.